**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,**

v.

**SAVANNAH BANK & TRUST COMPANY OF SAVANNAH, Appellee.**

No. 22356.

United States Court of Appeals Fifth Circuit.

June 27, 1966.

Attys., Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., for appellant.

James P. Houlihan, Jr., Savannah, Ga., Connerat, Dunn, Hunter, Houlihan & Maclean, Savannah, Ga., for appellee.

Before TUTTLE, Chief Judge, THORNBERRY, Circuit Judge, and LYNNE, District Judge.

THORNBERRY, Circuit Judge:

The state-chartered Savannah Bank & Trust Company of Savannah, Georgia, owns a fifteen story building located in Savannah—the first four floors (22%) are occupied by the Bank, and the remaining eleven floors (78%) are rented to various tenants. The dispute here involves the asserted coverage, under the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., of the Bank employees whose duties are limited to the portion of the building leased to tenants.[1]

The Bank admits that the employees engaged in its banking operations are subject to the Act and are paid in accordance with the minimum wage provisions. These include maintenance employees whose duties relate to space occupied by the Bank. The Bank, however, denies that the employees whose duties are restricted to the rental office portion of the building are covered by the Act. As a result, the elevator starter and the maids employed to clean the tenant floors are paid less than the minimum wage; while the maids for the Bank floors, the watchmen and the maintenance men are paid in accordance with the Act.

The Secretary of Labor does not contend that the employees working on the leased floors were covered by the minimum wage provisions prior to 1961, but he asserts that the 1961 Amendments to the Act which added the "enterprise" provisions extended coverage to them. Essentially these provisions require the

Bessie Margolin, Associate Sol., Charles Donahue, Sol., Dept. of Labor, Robert E. Nagle, Anastasia T. Dunau,

1. There are two other district court decisions involving basically the same issues as presented here. Wirtz v. Columbian Mutual Life Ins. Co., W.D.Tenn.1965, 246 F.Supp. 198 (on appeal to the 6th Cir.); Wirtz v. First National Bank & Trust Co., W.D.Okla.1965, 239 F.Supp. 613 (on appeal to the 10th Cir.).

payment of the minimum wage to any employee who "is employed in an enterprise engaged in commerce or in the production of goods for commerce, * * * by an establishment described in section 203(s) (3) or (5) of this title." 29 U.S.C. § 206 (b). The following definitions are relevant in applying this provision:

203(r) "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: * * *

203(s) "Enterprise engaged in commerce or in the production of goods for commerce" means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person: * * *

(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000; * * *

I. Definition of "Enterprise"

The statutory definition of "enterprise" requires the existence of three elements: (1) related activities, (2) unified operation or common control, and (3) a common business purpose. The Bank admits the presence of the second element, common control, but denies the existence of the other elements. To determine whether there is related activ-

ity "performed * * * for a common business purpose," we must first examine the relationship of the operation of the Bank and the office building.

A senior Bank official directs the operation and maintenance of the entire building. Rental rates are established by the finance committee of the Bank, and rent receipts are handled by the trust department. Rental income, depreciation, building repairs and taxes attributable to the office portion of the building are included in the Bank's income tax return. The Bank does not pay rent for the space it occupies. The maintenance crew consists of fifteen maids (one for each floor), a supervisor of maids, maintenance men, an elevator starter and watchmen. All these employees, except the four maids assigned to clean the Bank floors, are carried on a separate payroll. Only the office building maids and the elevator starter, however, are paid less than the minimum wage. From these facts it is clear that the Bank and the office building are operated as a single unit, with the exception of the separate payroll for the office building employees. Common control, as conceded by the Bank, is obviously present.

The legislative history provides some assistance in ascertaining the meaning of "related activities performed * * * for a common business purpose." The Report of the Senate Committee on Labor and Public Welfare[2] states that the "enterprise" provisions are designed to extend coverage to all employees of any establishment (with certain exceptions)

"which now has some employees who are and others who are not individually engaged in commerce, or in the production of goods for commerce, if the establishment is in an enterprise which has an annual gross volume of sales of not less than $1 million. * * * The purpose of this provision is to eliminate fragmentation of coverage in the establishments of these large enterprises and prevent continuance of a

2. S.Rep. No. 145, 87 Cong., 1st Sess 31 (1961), U.S. Code Congressional and Administrative News 1961, p. 1620 [hereinafter cited as S.Rep.]

situation in which some of the employees in such an establishment have the protection of the act while others who work side by side with them do not * * *.

* * * * * *

"Related activities conducted by separate business entities will be considered a part of the same enterprise where they are joined either through unified operation or common control into a unified business system or economic unit to serve a common business purpose.

"The bill's approach is to treat as separate enterprises those businesses which are unrelated to each other. For example, if a single company owns several retail apparel stores and is also engaged in the lumbering business, the sales of the lumbering business would not be included in the annual dollar volume in determining whether the $1 million test under section 3(a) (1) has been met. The employees of the lumbering business would not be included in the 'enterprise' even if the $1 million test were met since they are not engaged in the 'related activities' of the retail stores.

"Within the meaning of this term, activities are 'related' when they are the same or similar, such as those of the individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements. *They are also 'related' when they are auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services.* Likewise, activities are 'related' when they are part of a vertical structure such as the manufacturing, warehousing, and retailing of a particular product or products under unified operation or common control for a common business purpose."

(Emphasis added). See also H.R.Rep. No. 75, 87th Cong., 1st Sess. 7–8 [hereinafter cited as H.R.Rep.]

■ The Secretary asserts that "the management of the bank building as an integral part of defendant's banking operations clearly serves the essential 'auxiliary and service' function of providing the Bank with the premises for conducting its present business, as well as space in which to expand in the future." We agree. The operation of the office building cannot be divorced from that of the Bank, as contended by the appellee. The appellee admits that the primary purpose of constructing a building with space far in excess of the actual needs of the banking operation is to spread the very high cost of real estate in the downtown area. Thus, the revenue-producing capacity of the office space in the Bank building is necessary to enable the Bank to occupy its present location. In addition to providing space for future expansion, the building stands as a symbol in the public mind of the stability and the position of the Bank in the community. As candidly revealed by appellee, there are also certain tax advantages to the Bank which result from the ownership of real estate under state law. Thus, there is a very real relationship between the operation of the office building and the Bank sufficient to satisfy the statutory requirement. See Wirtz v. Columbian Mutual Ins. Co., W.D. Tenn. 1965, 246 F.Supp. 198, 201–02.

Several of these connecting factors between the Bank and the office building would not be present if the two operations were physically separated into two buildings located at some distance from each other. Thus, an office building owned by the Bank on the other side of the city or in another city would not serve the functions of spreading the cost of the real estate upon which the Bank is built or of providing room for Bank expansion. Nor would the two separate buildings be likely to evoke the public image created by a large bank-office complex. The arguments pressed by the appellee seem to treat the Bank and the office building as if the two operations were completely separated in this manner and to ignore

the ramifications of their physical connection.[2a]

Many of the same considerations discussed above are also relevant in determining the existence of "common business purpose." The reference to this term in the legislative history is brief:

> "[I]n order for 'related activities' to be part of an enterprise they must be performed for a 'common business purpose.' Eleemosynary, religious, or educational and similar activities of organizations which are not operated for profit are not included in the term 'enterprise' as used in this bill. Such activities performed by nonprofit organizations are not activities performed for a common business purpose."

S. Rep. at 41; H.R. Rep. at 8. If we were to consider this statement alone, it would appear that the term was merely designed to eliminate non-profit activities from the coverage of the enterprise provisions. We need not, however, rely exclusively on this quotation since a common business purpose is found in the operation of the office building to enable the Bank to locate in a desirable downtown area, to provide space for future expansion, to improve the Bank's profit position, both from the standpoint of revenue and taxes, and to strengthen the image of the Bank in the public eye. We, therefore, conclude that the Bank and the operation of the office building constitute an "enterprise" under the provisions of the Fair Labor Standards Act since they are "related activities performed * * * through * * * common control * * * for a common business purpose. * * *"

## II. Gross Sales of One Million Dollars

The next prerequisite to coverage under the Act is the requirement that "the annual gross volume of sales of such enterprise is not less than $1,000,000 * * *." 29 U.S.C. § 203(s) (3). The Secretary's Complaint in the District Court alleged that "Defendant's annual gross volume of sales, including its sales of office building space, is not less than $1,000,000.00." The Bank admitted the allegation contained in that paragraph of the Complaint with the exception that it denied the existence of a related business activity performed for a common business purpose. Defendant also stated that it would show that "the gross volume of *rentals* in its office building is less than $1,000,000.00." (Emphasis added.) Although it does not appear from the record that the Bank ever asserted in the district court that its sales were less than the necessary amount, it now attempts to repudiate the admission found in its Answer of August 23, 1962, and to persuade this Court to permit it to amend that Answer "to conform to the evidence heretofore introduced at the trial of this cause without objection * * *." The evidence to which the appellee refers is the Bank's Annual Report for the year 1962, introduced by the Secretary. The Report allegedly shows that the Bank has no sales.

■ Rule 15(b) of the Federal Rules of Civil Procedure provides for amendments of the pleadings to conform to the evidence "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties * * *." Rule 15(b), however, by its own terms is not applicable here since the matter was raised by the Secretary's Complaint and admitted by the Bank. Nor was the question of the amount of sales litigated by the parties "by express or implied consent." The Annual Report was offered as evidence of the relationship of the Bank and the operation of the office building. That the Report also indicates the amount of income of the Bank does not bring it within the terms of Rule 15(b). See Simms v. Andrews, 10th Cir. 1941, 118 F.2d 803, 807.[3]

---

2a. Our reference to Bank ownership of a separate office building is not meant to infer the legality of such ownership but to illustrate the ramifications of physical connection.

3. "The right to amend pleadings to conform to the proof proceeds upon the theory that by such amendment the pleadings are brought in line with the actual issues upon which the case was tried, even though

■ This motion on appeal in the guise of a Rule 15(b) amendment seeks not only to nullify an earlier admission but also to assert a new defense not previously pleaded. This cannot be done. See Systems Inc. v. Bridge Electronics Co., 3d Cir. 1964, 335 F.2d 465, 466–467; United States v. Sinor, 5th Cir. 1956, 238 F.2d 271, 277, cert denied, 353 U.S. 985, 77 S.Ct. 1287, 1 L.Ed.2d 1144; Simms v. Andrews, supra; 1A Barron & Holtzoff, Federal Practice and Procedure § 449, at 780 (Wright ed. 1960); 3 Moore, Federal Practice ¶ 15.13, at 991–92 (1964). The motion to amend appellee's answer is therefore denied.

■ Even if the amendment were proper, we would be constrained to agree with the analysis of the District Court in Wirtz v. Columbian Mutual Life Ins. Co., supra, 246 F.Supp. at 203–204, which concludes that Congress, in prescribing the million dollar test for Section 203(s) enterprises, intended to go beyond a restricted definition of the term "sales" to establish a standard of coverage based upon the size of a business. This position finds considerable support in the legislative history of the amendments as seen from the following quotation from the Senate Report:

"The million dollar test is *an economic test*. It is the line which the Congress must draw in determining who shall and who shall not be covered by a minimum wage. It is a way of saying that anyone who is operating *a business of that size* in commerce can afford to pay his employees the minimum wage under this law."

S.Rep. at 5. (Emphasis added.) In its discussion of the method of calculating the annual dollar volume, the Senate Report uses the terms "gross receipts" and "gross business" interchangeably with "sales." [4]

Section 203(k) of the Act defines "sale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." The Bank contends that the term "sales" must be given a "literal interpretation" and that such an interpretation would not include rental receipts, interest on loans and securities or income

---

such issues were not stated in the pleadings as originally drawn. In such case it is the duty of the court, after the evidence upon the supposed issue has been introduced without objection, to permit the amendment. Rule 15(b) * * *. This rule, however, does not authorize such an amendment merely because evidence which is competent and material upon the issues created by the pleadings incidentally tends to prove another fact not within the issues in this case."

4. "8. *Measuring the annual dollar volume of sales*
Under the bill, an 'enterprise in section 3 (s) (1), (3), and (4) [3(s) (4) was renumbered as 3(s) (3) in the bill as enacted] must have $1 million or more in annual sales. The method of calculating *the requisite dollar volume of sales or business* will be the same as is now followed under the law with respect to calculating the annual dollar volume of sales in retail and service establishments, and in laundries under the exemptions provided in section 13(a) (2), (3), (4), and (13) of the act. The procedure for making the calculation is set forth in the Department's Interpretative Bulletin * * *.

As it is there stated, the 'annual dollar volume of sales' consists of the gross receipts from all types of sales during a 12-month period.

\* \* \* \* \*

"In applying this rule, *the gross receipts or gross business* of an 'enterprise' for such 12-month period will constitute its annual dollar volume for that period even though the establishment did not operate throughout the entire year.
"When a new business is commenced, the employer will necessarily be unable for a time to determine its annual dollar volume on the basis of the preceding annual period described above, because the business will have no *gross receipts* during such period. In such cases, for purposes of determining the applicability of the act in workweeks falling within the calendar quarter in which the business commenced operations, the *gross receipts* of such new business during the period which it has been in operation will be taken as representative of its annual dollar volume in applying the test of section 3 (s). Thereafter, the analysis can be based on the period described above."
S.Rep. at 38 (Emphasis added.)

from services.[5] It is, however, difficult to accept this proposition when other sub-sections of 203(s) refer to annual gross volume of sales of service establishments [203(s) (1)], from operating streetcars and buses [203(s) (2)] and of gasoline service establishments [203(s) (5)]. Thus it is clear that "sales" at least is broad enough to encompass certain service enterprises. This conclusion is further bolstered by the statement in the legislative history that the "enterprise" provisions would extend coverage to additional employees in such enterprises as "wholesale, trade, finance, insurance, real estate, transportation, communications, and public utilities, and business, accounting, and similar services * * *," S.Rep. at 31, thus including a number of industries which would not qualify under a restricted definition of "sales."

The Bank calls attention to 203(s) (4) which speaks in terms of the annual gross volume of *business* in reference to construction enterprises to support its contention that Congress knew how to establish a standard based upon the size of the business rather than upon the volume of "sales." See Wirtz v. First National Bank & Trust Co., W.D.Okl. 1965, 239 F.Supp. 613, 618. This single provision does not convince us that Congress intended to draw such a distinction in the face of statements in the legislative history which would indicate the contrary intention.

The definition of "sale" to include "any sale" in effect leaves us without much guidance. It cannot be doubted that "sale" has a broader meaning than that urged by the Bank, since the Act specifically includes certain service industries, such as streetcars and buses. In the light of the liberal interpretation that we are required to place upon the

Act,[6] it is not farfetched to interpret "sales" to include interest on loans and securities and rental from office space. In reality, leasing an office is a "sale" of space in a building for a certain period, just as a loan is the "sale" of the use of an amount of money. We conclude, therefore, that the gross-volume-of-sales test was intended as a measure of the size of the enterprise and that the income reported by the Bank satisfies this test.

### III. Establishment

■ The final requirement under the enterprise provisions for imposing coverage in the instant situation is that there be "employees engaged in commerce or in the production of goods for commerce" in "any establishment of any such enterprise." § 203(s) (3). While no definition of the crucial term "establishment" is found in the Act, the term has been interpreted in the context of other provisions of the Act prior to the 1961 Amendments to mean "a distinct physical place of business." A. H. Phillips, Inc. v. Walling, 1945, 324 U.S. 490, 496, 65 S.Ct. 807, 810, 89 L.Ed. 1095; Mitchell v. Gammill, 5th Cir. 1957, 245 F.2d 207, 211. Since Congress did not indicate an intention to deviate from this definition of the term when it added the 1961 Amendments, we must conclude that the "establishment" in the present case is the entire building, including the Bank operation. Inasmuch as the Bank admits that the employees in its banking and trust operation are engaged in commerce, this last prerequisite of coverage is satisfied.

The application here of the minimum wage laws to the employees working in the office portion of the Bank building is clearly in harmony with the purpose of the "enterprise" amendments to elimi-

---

5. The Bank's income in 1962 consisted of the following:

| | |
|---|---|
| Interest on loans | $1,671,801.02 |
| Interest on securities | 521,725.16 |
| Income from services | 456,523.45 |
| Rental from office space | 113,494.27 |
| Total | $2,763,543.90 |

6. Mitchell v. Lublin, McGaughy & Assoc., 1959, 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243; Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 429, 75 S.Ct. 860, 862, 99 L.Ed. 1196; Mitchell v. Empire Gas Engineering Co., 5th Cir. 1958, 256 F.2d 781, 784.

nate situations in which some employees in an establishment of a large enterprise have the protection of the Act while others who work side by side with them do not.

The judgment of the district court is reversed and remanded.