**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,**

v.

**COLUMBIAN MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellant.**

No. 17152.

United States Court of Appeals Sixth Circuit.

June 23, 1967.

904

Robert L. Green, Memphis, Tenn., for appellant, Neely, Green & Fargarson, Memphis, Tenn., on brief.

Anastasia T. Dunau, Atty., Dept. of Labor, Washington, D. C., for appellee, Charles Donahue, Solicitor of Labor, Bessie Margolin, Associate Solicitor, Robert E. Nagle, Atty., Dept. of Labor, Washington, D. C., Jeter S. Ray, Regional Atty., Dept. of Labor, Nashville, Tenn., on brief.

Before WEICK, Chief Judge, PECK, Circuit Judge, and CECIL, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

The Secretary of Labor brought this action pursuant to 29 U.S.C.A. § 217, to restrain appellant, the Columbian Mutual Life Insurance Company, from violating the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C.A. §§ 206(b), 207(a) (2) and 215(a) (2), and from failing to maintain records as required by sections 211(c) and 215(a) (5) of Title 29 U.S.C.A.

The District Court found that appellant's maintenance and custodial employees who work at the Columbian Mutual Tower Building were covered under the 1961 amendments to the Act, and entered judgment for the Secretary.

Appellant is a mutual life insurance company which occupies as its home office approximately 11% of the available space in the Columbian Mutual Tower Building in Memphis, Tennessee. After acquiring a 99-year lease to the premises, defendant constructed this twenty-one story building for purposes of providing suitable quarters for its insurance business as well as an investment outlet. Building space which appellant does not use is leased to miscellaneous tenants.

Appellant has a contract of employment with an agent, Percy Galbreath & Son, Inc., under which the latter performs certain management services, including leasing the building space to tenants and collecting and transmitting the rents to appellant. This agent, subject to appellant's approval, also hires the maintenance and custodial personnel, which number approximately twenty-one. These employees are paid by appellant and the District Court found that appellant retains, and has exercised, the right to fix the wages paid these employees and to have them removed. In addition, the District Court found that appellant has an equal voice along with its agent in determining the rent charged, approving requisitions for supplies, prescribing rules and regulations for the operation of the building, and in approving alterations in the floor plans. It is admitted that many of the custodial personnel have not been paid the statutory wage under the Act, and it is the coverage of these employees which is in question.

The Secretary claims that these employees are covered by virtue of the "enterprise" provisions which were added to the Act by amendment in 1961. Minimum wage and overtime protection extend to all employees of an establishment of an enterprise if the establishment has two or more employees engaged in commerce or in the production of goods for commerce and if the "annual gross volume of sales of such enterprise" is not less than $1,000,000.

Section 3(r) of the Act (29 U.S.C.A. § 203(r)) provides in part:

"(r) 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: * * *"

Section 3(s)(3) of the Act provides:

"(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

* * * * * *

"(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000; * * *"

In holding that coverage existed under the "enterprise" provisions of the Act, the District Court necessarily found, first, that the operation of an insurance company and the maintenance of an office building constituted an enterprise within the meaning of section 3(r), in that these were (1) related activities (2) performed through unified operation or common control (3) for a common business purpose; second, that the annual "gross volume of sales" of the enterprise was not less than $1,000,000; and third,

that the establishment of the enterprise in which the custodial employees worked had two or more employees engaged in commerce or in the production of goods for commerce. Appellant challenges the District Court's conclusions with respect to each of the three basic questions.

With respect to the first question of whether an enterprise existed within the meaning of section 3(r), appellant concedes that the element of "common control" has been established. It contends, however, that the District Court erred in holding that the operation of an insurance company and the maintenance of an office building were "related activities performed * * * for a common business purpose."

The phrase "related activities" is not defined. Looking to the legislative history of the Act, however, Senate Report No. 145, 87th Cong., 1st Sess., 2 U.S. Code Cong. & Admin.News (1961), p. 1660 [hereinafter the "Senate Report"] states that activities are related not only when they are "the same or similar" or "part of a vertical structure," but also when "they are auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services." After referring to this Report, the District Court ruled that appellant's home office and office building activities were related for the reasons that the building constituted an outlet for investment of appellant's funds and provided appellant with home office space presently and expansion space for the future; and that appellant used the building to indicate its solidarity to the public by use of a picture of the building on its stationery and other advertising material, and by calling it the Columbian Mutual Tower Building. Moreover, the maintenance employees provide the same general services to appellant as they did to the building's other miscellaneous tenants.

■ In support of its position that the activities were not related, appellant relied primarily on two district court cases "involving the same factual issues as presented in this case," Wirtz v. Savannah Bank & Trust Co., 247 F.Supp. 547 (S.D.Ga.1964), and Wirtz v. First Nat'l Bank & Trust Co., 239 F.Supp. 613 (W.D.Okla.1965), both of which held that banking activities were not related to the maintenance and renting of an office building which the Bank owned and partially occupied. Both cases, however, had been reversed at the time of oral argument in this court. Said the Court of Appeals for the Fifth Circuit:

"The Secretary asserts that 'the management of the bank building as an integral part of defendant's banking operations clearly serves the essential "auxiliary and service" function of providing the Bank with the premises for conducting its present business, as well as space in which to expand in the future.' We agree. The operation of the office building cannot be divorced from that of the Bank * * *. Several * * * connecting factors between the Bank and the office building would not be present if the two operations were physically separated into two buildings located at some distance from each other. Thus, an office building owned by the Bank on the other side of the city or in another city would not serve the functions of spreading the cost of real estate upon which the Bank is built or of providing room for Bank expansion. Nor would the two separate buildings be likely to evoke the public image created by a large bank-office complex. The arguments pressed by the appellee seem to treat the Bank and the office building as if the two operations were completely separated in this manner and to ignore the ramifications of their physical connection." Wirtz v. Savannah Bank & Trust Co., 5 Cir., 362 F.2d 857, 860–861 (1966), reversing 247 F.Supp. 547, supra.

Since this sound reasoning is equally applicable here, the District Court did not err in deciding that the home office and office building activities were

related within the meaning of section 3(r). See also Wirtz v. First Nat'l Bank & Trust Co., 365 F.2d 641 (10th Cir. 1966), reversing 239 F.Supp. 613, supra.

The District Court also correctly concluded that the closely related requirement of the enterprise concept, that the related activities be performed "for a common business purpose," was satisfied in the instant case. While a company's nonprofit activities do not fall within the "common business" requirement, it is settled that a profit motive alone will not justify the conclusion that related activities are performed for a common business purpose. However, the considerations previously discussed are pertinent to this issue, and since it is readily apparent that appellant's ownership and maintenance of the office building does further its insurance business, both from the standpoint of facilitating the internal operation of the business and from the standpoint of establishing a favorable public image, the home office and office building activities are performed "for a common business purpose" within the meaning of section 3(r).

The second major issue is whether appellant had not less than $1,000,000 in "annual gross volume of sales" for the years 1961 to 1963, inclusive. It was stipulated that appellant's annual premium income for this period was never greater than $884,171, although its total gross annual receipts for these years, including all investment income, amounted to at least $1,368,415. The specific issue, therefore, is whether appellant's investment income constituted "gross sales" within the meaning of the Act.

Pursuant to section 3(k) of the Act, a sale "includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C.A. § 203(k). This definition is of little help here and appellant's position is that the District Court erred in failing to apply the ordinary and accepted definition of the term "sale," which, to paraphrase appellant, is the passing or transfer of title or property rights in exchange for a price paid or a promise. Appellant thus contends that since it only sells one product, life insurance, the sole measure of its "gross sales" is its premium income.

In construing section 3(s) (3), the District Court properly rejected a literal or restrictive interpretation of the term "sales," for, as the Supreme Court stated:

"[W]ithin the tests of coverage fashioned by Congress, the Act has been construed liberally to apply to the furthest reaches consistent with congressional direction."

Mitchell v. Lublin, McGaughy & Assoc., 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L. Ed.2d 243 (1959); See also Mitchell v. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196 (1955). Further, "other sub-sections of 203(s) refer to annual gross volume of sales of service establishments [203(s) (1)], from operating streetcars and buses [203(s) (2)] and of gasoline service establishments [203 (s) (5)]. Thus it is clear that 'sales' at least is broad enough to encompass certain service enterprises." Wirtz v. Savannah Bank & Trust Co., supra, 362 F.2d at 863.

As the District Court noted, the legislative history of the Act reveals that "finance" companies, "whose income would certainly be interest," were intended to be embraced within the enterprise provisions of the 1961 amendments. Both the House and Senate Reports provide:

"This section [now 3(s) (3)] would provide minimum wage and overtime protection under the act for approximately 100,000 additional employees in such enterprises as wholesale trade, finance, insurance, real estate, transportation, communications, and public utilities, and business, accounting, and similar services."

Senate Report p. 1650; House Report No. 75, 87th Cong., 1st Sess., p. 13. And, as indicated above, it has now been judicially established that banking enterprises are covered under the Act. While

not suggesting that the operation of a bank is identical with the operation of an insurance company, it is difficult to perceive why income derived from a bank's investments should be counted as gross sales, while the investment income of an insurance company recognized as a major source of underwriters' revenue, would not similarly be included.

■ Following the analyses that "[i]n reality * * * a loan is the 'sale' of the use of an amount of money," Wirtz v. Savannah Bank & Trust Co., supra, 362 F.2d at 863, and that the renting or leasing of office space in an office building constitutes "a 'sale' of space in a building for a certain period," Ibid., or a "disposition" of property within the meaning of the statutory definition, Wirtz v. First Nat'l Bank & Trust Co., supra, 365 F.2d at 645, it would appear that most, if not all, investment income would be included as part of an enterprises "gross sales" for purposes of the Act, regardless of the type of business or the nature of the investment. Indeed, there is legislative history in support of the position that the term "sale" may be used interchangeably with "gross receipts" or "gross business." *

■ In connection with the observation that "sale" may be synonomous with "gross receipts," appellant argues that Congress did not intend that investment income be embraced within the gross sales test as evidenced by the deliberate selection of the term "sale" rather than a more comprehensive phrase such as "gross volume from the business" which appears in section 3(s) (4) of the Act. However, as this court recently stated in another Fair Labor Standards Act case:

"An examination of the many cases dealing with statutory construction reveals that legislatures do not always use apt words to express their intent. The Court will look to the legislative purpose of the Act and follow that purpose even though a literal reading of the language used would suggest a different conclusion."

Wirtz v. Allen Green & Assoc., Inc., 6 Cir., 379 F.2d 198 (1967). Thus it is here determined that with respect to insurance companies as in the case of banks, where the investment of money in various manners constitutes an integral and closely related aspect of the general overall business, and the income received from such investments constitutes a regular and substantial portion of such enterprises total annual income, investment income (whether denominated investment income or not) is properly includable within the enterprises "annual gross volume of sales" as that term is used in 3(s) (3). This conclusion does not extend the scope of the Act beyond permissible limits, as indicated by the statutory language when read in light of the legislative history, and it is clearly in accord with the above mentioned principle that coverage provisions of this remedial Act be liberally construed.

The economic test embodied in section 3(s) (3) was changed by the Fair Labor Standards Amendments of 1966 to read "annual gross volume of sales made *or business done*." (Emphasis added.) It is of course arguable that the purpose of the amendment was to extend coverage to enterprises which Congress had theretofore intentionally excluded by use of the narrowly defined gross sales test. However, Senate Report No. 1487, 89th Cong., 2d Sess., p. 7, U.S.Code Cong. & Admin. News 1966, p. 3002, provides:

"The phrase 'business done' has been added to the definition of 'enterprise engaged in commerce or in the production of goods for commerce' to reflect more clearly the intended meaning of the economic test of business size expressed in the present act in terms of 'annual gross volume of sales *

---

\* In discussing the method of calculating the annual dollar volume of sales under section 3(s) (1), (2) and (4) [3(s) (4) was enacted as 3(s) (3)] the Senate Report uses the terms "gross receipts" and "gross business" interchangeably with "sales." Sen.Rept. at p. 1657.

This test, as shown by Senate Report No. 145 * * * (and now judicially confirmed by the courts in Wirtz v. Savannah Bank & Trust Company (C.A. 5, June 27, 1966) [362 F.2d 857] and Wirtz v. Columbian Mutual Life Insurance Company, 246 F.Supp. 198), [the instant case] is intended to measure the size of an enterprise for purposes of enterprise coverage in terms of the annual gross volume in dollars * * * of the business transactions which result from activities of the enterprise, regardless of whether such transactions are 'sales' in a technical sense."

Although this Report apparently goes beyond the decision herein in attributing a broad meaning to the word "sale," it is clear that the purpose of the recent amendment was not to extend coverage but rather, to clarify the provision under consideration and to "remove any possible reason for misapprehension." It follows that the District Court correctly held that appellant's investment income should be included as part of its "annual gross volume of sales."

 The third question presented here is whether the maintenance and custodial workers are employed at an establishment which has at least two employees "engaged in commerce or in the production of goods for commerce." Admittedly, appellant's employees engaged in insurance activities are engaged in commerce, and the issue is thus whether the entire building is a single establishment or whether the maintenance employees are employed by an establishment separate from that of the insurance employees. The District Court held alternatively that the building constituted a single establishment, and that even if the custodial workers are employed at a separate establishment, there were two or more workers engaged in commerce. For the reasons set forth by the Fifth Circuit, the single establishment holding is correct:

"While no definition of the crucial term 'establishment' is found in the Act, the term has been interpreted in the context of other provisions of the Act prior to the 1961 Amendments to mean 'a distinct physical place of business.' A. H. Phillips, Inc. v. Walling, 1945, 324 U.S. 490, 496, 65 S.Ct. 807, 810, 89 L.Ed. 1095; Mitchell v. Gammill, 5th Cir. 1957, 245 F.2d 207, 211. Since Congress did not indicate an intention to deviate from this definition of the term when it added the 1961 Amendments, we must conclude that the 'establishment' in the present case is the entire building, including the Bank operation." Wirtz v. Savannah Bank & Trust Co., supra 362 F.2d at 863.

For the above reasons, the judgment of the District Court is affirmed.