George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

ARNHEIM AND NEELY, INC., a corporation, Defendant,

and

The Institute of Real Estate Management of the National Association of Real Estate Boards, Intervener.

Civ. A. No. 67-1202.

United States District Court, W. D. Pennsylvania.

Sept. 30, 1969.

As Amended Oct. 6, 1969.

Louis Weiner, Regional Solicitor U. S. Department of Labor, Philadelphia, Pa., Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Eugene B. Strassburger, Jr., Strassburger & McKenna, Pittsburgh, Pa., for defendant.

Frank L. Seamans, Eckert, Seamans & Cherin, Pittsburgh, Pa., for intervener.

OPINION

JOHN L. MILLER, District Judge.

By his Complaint, plaintiff, Secretary of Labor of the United States Department of Labor, seeks injunctive relief to enjoin alleged violations of Sections 15 (a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 215(a) (2), 215(a) (5).

Defendant, Arnheim and Neely, Inc., is a Pennsylvania corporation engaging in real estate management, brokerage sales, real estate appraisals, insurance sales, and miscellaneous other real estate management activities. It answered the Complaint denying salient allegations thereof.

On January 17, 1968, the Institute of Real Estate Management of the National Association of Real Estate Boards filed a motion to intervene as a defendant under Rule 24 of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 24. On January 13, 1969, "[b]y agreement of the parties," the Court granted the Motion " * * * with the understanding that litigation will not be extended beyond the facts relating to the business operations of defendant Arnheim and Neely, Inc. during the relevant period." Intervener answered the Complaint on January 17, 1968, denying salient allegations thereof.

On December 19, 1968, the parties filed a lengthy Stipulation [hereinafter abbreviated "Stip." 1.[1] On March 20, 1969, plaintiff moved for summary judgment " * * * on the ground that the stipulation of the parties filed herein and the pleadings show that no genuine issue of material fact exists * * * and that the plaintiff is entitled to judgment as a matter of law." On April 9, 1969, defendant and intervener moved for summary judgment asserting lack of a contested factual issue and demanding judgment as a matter of law.[2]

According to the Stipulation, defendant, since January 1, 1963, has managed nine buildings in the Greater Pittsburgh area.[3] [Stip. ¶204] Defendant owns none of these buildings. [Stip. ¶208] [4] Its rentals and sales are performed by approximately fourteen employees on de-

fendant's payroll. [Stip. ¶210] The case at bar concerns "persons employed in maintenance, custodial and operational activities at the buildings managed by the defendant. * * * " [Stip. ¶2]

The Stipulation sets forth issues formulated from the pleadings. [Stip. ¶1–8] This Opinion will review these issues of law so tendered.

### ISSUE

"Are the various persons employed in maintenance, custodial and operational activities at the buildings managed by the defendant 'employees' of the defendant within the meaning of the Act?" [Stip. ¶2]

Paragraph 303 of the Stipulation asserts:

"In the management and maintenance of the managed properties, Arnheim and Neely, Inc., at all times acting pursuant to their contracts with the building owners, engages in the following:

a) Arnheim and Neely, Inc. hires all labor and employees required for the operation and maintenance of the managed premises. The hiring and pay of the building superintendents are occasionally subject to approval of the building owners.

b) Arnheim and Neely, Inc. discharges all labor and employees required for the operation and maintenance of the managed premises.

c) Arnheim and Neely, Inc. supervises all labor and employees required for the operation and maintenance of the managed premises.

d) Arnheim and Neely, Inc. provides a managerial person (separate and apart from the building superintendent) in re-

---

1. Although the Stipulation was filed prior to the Order granting leave to intervene, the Stipulation was executed by counsel for intervener.

2. The following were also filed: "Plaintiff's Brief in Support of Summary Judgment"; "Defendants' Brief In Support of Summary Judgment", filed jointly by defendant and intervener; and Plaintiff's

"Reply Brief in Support of Summary Judgment."

3. Defendant maintains its principal office and place of business in the Grant Building, Pittsburgh, Pennsylvania. [Stip. ¶201]

4. Defendant owns 50 of 2850 shares of a corporation which owns one of the buildings. [Stip. ¶208]

gard to most, if not all of the managed properties.

e) Arnheim and Neely, Inc. schedules the hours to be worked by all persons engaged at the managed properties.

f) Arnheim and Neely, Inc. determines the rates of pay of all employees engaged at the managed properties, subject to approval of building owners without exception. * * *

g) Arnheim and Neely, Inc. determines the method of payment of all persons engaged at the managed properties, subject to union agreement, if any.

h) Arnheim and Neely, Inc. establishes fringe benefits for all persons engaged at the managed properties, subject to owner's approval.

i) Arnheim and Neely, Inc. negotiates union contracts in regard to those persons engaged at the managed properties who are union members. * * *

j) Arnheim and Neely, Inc. prepares the payroll for all persons engaged at the managed properties.

k) All persons engaged at the managed properties are paid by means of Arnheim and Neely, Inc. checks, drawn on the appropriate owner's account.

l) Persons on Arnheim and Neely, Inc's [sic] staff are assigned managerial responsibility for one or more of the particular buildings.

m) Arnheim and Neely, Inc., through its staff manager or through the building superintendent, assigns the persons engaged at the buildings to the various required duties and supervises the performance thereof.

n) Promotions or reductions in rank and increases or decreases in pay as to the persons engaged at the managed buildings are determined by Arnheim and Neely, Inc., subject to owner's approval.

o) Arnheim and Neely, Inc. makes legal deductions, including Income Tax, Social Security, etc., from the pay checks of all persons engaged at the managed buildings.

p) The 'Contract for Management' (Exhibit 1 [to the Stipulation]) provides, with respect to the managed buildings, 'that all employees shall be deemed the employees of the OWNER and not the AGENT.'"

Elsewhere in the Stipulation, it is asserted that "[e]ach building owner has separate employer's identification numbers for federal, state, and city payroll taxes." [Stip. ¶301(g)]

Section 3 of the Fair Labor Standards Act defines the following terms:

\* \* \* \* \* \*

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *." 29 U.S.C. § 203(d).

"(e) 'Employee' includes any individual employed by an employer." 29 U.S.C. § 203(e).

In Greenberg v. Arsenal Bldg. Corp., 50 F.Supp. 700 (S.D.N.Y.1943), aff'd per curiam 144 F.2d 292 (2 Cir. 1944), rev'd in part on other grounds sub nom Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), where suit was brought against a building rental agent, both the District and the Circuit Court held the defendant to be an "employer" within the meaning of the Act.[5]

■ Viewed broadly, the relationship described in the Stipulation between defendant and the employees comports with the statutory standard of employer-employee. See United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947). It remains only to review certain aspects peculiar to this relationship to determine whether or not they require a contrary determination.

5. *Greenberg* asserted liability on the ground that the rental agent was an "employer" "acting directly or indirectly in the interest of an employer in relation to an employee * * *." 50 F.Supp. 703; cf. United States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487 (2 Cir. 1960). As developed more fully, *infra*, our analysis does not view defendant as simply "acting * * * in the interest of an employer."

In Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, 172 A.L.R. 317 (1947), band leaders resisted liability to their musicians on the grounds, *inter alia,* that the leaders' contracts with ballroom operators specified that the musicians were to be regarded as employees of the operators rather than of the leader. The agreements also required filing of various social security taxes by the operators. Notwithstanding these features, the Supreme Court, reversing the Circuit Court's judgment, held the leaders liable.

■■ The sole remaining element to be considered is the reservation by the owners of a right to review certain of defendant's determinations regarding the management of its building. It may well be that these provisions vest the owners with certain control over the employees. However, the Act recognizes the concept of joint employment. Mitchell v. John R. Cowley & Bro., Inc., 292 F.2d 105 (5 Cir. 1961); Wirtz v. Hebert, 368 F.2d 139 (5 Cir. 1966); Mid-Continent Pipe Line Co. v. Hargrave, 129 F.2d 655 (10 Cir. 1942). Although the proprietors of the individual buildings may perhaps be deemed employers, Wirtz v. Columbian Mutual Life Ins. Co., 246 F.Supp. 198, 201 (W.D.Tenn.1965), this circumstance does not foreclose treating defendant as an employer within the meaning of the Act.

■ Defendant contends that Congress' adoption of the "enterprise" formula in 1961 requires a new test for determining the employer-employee relationship. We cannot agree. The Fair Labor Standards Amendment of 1961, Pub.L. 87–30; 75 Stat. 65 (U.S.Code Cong. & Adm.News 1961, p. 71 et seq.), changed the bases of the prior provision limiting coverage to employees "engaged in commerce or in the production of goods for commerce" and provided coverage to all employees in an " 'enter-

prise' engaged in commerce or production for commerce." Maryland v. Wirtz, 392 U.S. 183, 185, 186, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). The 1961 amendments were unaccompanied by any modification in the definition of "employee", "employer" or "employment." [6] The decisional law reflects no change in the pre-1961 principle utilized for determining the employer-employee relationship.

Defendant relies on the statement in Bartels v. Birmingham, *supra*: " * * * In the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service." 332 U.S. 130, 67 S.Ct. 1550. It contends that the business to which they render service is the building rather than plaintiff.

The statement in Bartels must be interpreted in the light of the judicial history construing the term "employee." As described in Illinois Tri-Seal Products, Inc. v. United States, 353 F.2d 216, 173 Ct.Cl. 499 (1965), in the years following the enactment of the Act in 1935, the Treasury Department and a majority of the courts held that the term was to be given its common-law meaning, which was grounded in the element of control. In 1947, the Supreme Court decided United States v. Silk, *supra*, holding that a "constricted interpretation" of the term "employee" to exclude all who are independent contractors within common-law concepts failed "to accomplish the purposes of the legislation." 331 U.S. 712, 67 S.Ct. 1467.

Defendant seeks to utilize the "economic reality" doctrine to mitigate the indicia of its control of the employees. No warrant for this lies in the decisional law.

Defendant cites a section of the Senate Report No. 1487, 89th Cong., 2d Sess. (1966), on the 1966 Amendments to evidence a legislative intent to treat the

---

6. The Fair Labor Standards Amendments of 1966, Pub.L. 89–601; 80 Stat. 830 (U.S.Code Cong. & Adm.News 1966, p. 978 et seq.) likewise made no modifications in the statutory definitions.

employees in question as employees of the building owners:

"* * * where a person other than the owner of an apartment building is engaged by the owner to perform management services in connection with the operation of the building, these individuals employed at and resident in the building as managers, caretakers, janitors, or in a similar capacity shall be considered for the purposes of this subsection employees of the building owner." 1966 U.S.Code Cong. & Adm.News, p. 3029.

Senate Report No. 1487 proposed the inclusion of equivalent language in an amended section 3(s). However, the Senate-House Conference Committee rejected the Senate's proposed amendment. 1966 Cong.Rec. 22651 (daily ed. Sept. 14, 1966). The Congressional treatment of the issue fortifies our conclusion that the relationship between building employees and management-agents should be determined in accordance with the customary principles obtaining under the Act.

We conclude that the stipulated issue must be answered in the affirmative.

## ISSUE

"In determining 'annual gross volume of sales made or business done' by the defendant within the meaning of Section 3(s) of the Act, are the gross rentals from the aforementioned management activities to be included or merely the commissions obtained by the defendant from such activities?" [Stip. ¶6]

■ ' According to the Stipulation, the annual gross rental income collected by defendant from the managed buildings exceeded $1,000,000 per annum. [Stip. ¶206] Defendant's commissions on these rentals approximated or exceeded $200,000 in 1964 and 1965, and $250,000 in 1966 and thereafter. [Stip. ¶207] Commissions have never exceeded $500,000 per annum. [Ibid]

The Fair Labor Standards Amendments of 1961, *supra*, established as one condition to "enterprise" coverage an "annual gross volume of sales of such enterprise * * * not less than $1,-000,000." 29 U.S.C. § 203(s) (3) (1958 Ed. Supp. V). The Fair Labor Standards Amendments of 1966, *supra*, require for the period February 1, 1967, through January 31, 1969, a minimum "annual gross volume of sales" of $500,-000 and thereafter of $250,000. 29 U.S.C. § 203(s) (1) (1964) Ed. Supp. II).

Defendant contends that only its commissions of rentals should be included in determining its "annual gross volume of sales." In this instance, the statutory requirement for coverage would not have been satisfied until February 1, 1969. The Government argues that the computation of defendant's "annual gross volume of sales" requires inclusion of all rentals collected by defendant.

The Senate Report on the 1961 Amendments expressed the underlying philosophy of the provision and asserted:

"* * * The million dollar test is *an economic test*. It is the line which the Congress must draw in determining who shall and who shall not be covered by a minimum wage. It is a way of saying that anyone who is operating *a business of that size* in commerce can afford to pay his employees the minimum wage under this law." S.Rep., No. 145, 87th Cong., 1st Sess., U.S.Code Cong. & Adm.News 1961, p. 1624. Quoted in Wirtz v. Savannah Bank & Trust Co. of Savannah, 362 F.2d 857, 862 (5 Cir. 1966); Wirtz v. Columbian Mutual Life Ins. Co., *supra*, 246 F.Supp. 203; Wirtz v. First National Bank and Trust Co., 365 F.2d 641, 645n (10 Cir. 1966).

Defendant relies on two District Court opinions, Schmidt v. Randall, 160 F.Supp. 228 (D.Minn.1958), and Mitchell v. Carratt, 160 F.Supp. 261 (S.D.Fla.1956), wherein the plaintiffs' attempt to include the gross receipts of the defendants' sale of bus tickets were rejected in favor of computing only the defendants' commissions on the sales.

On the other hand, in Wirtz v. Jernigan, 405 F.2d 155 (5 Cir. 1968), at issue

was the computation of the defendant's sale of bus tickets as an agent of Greyhound Corporation. Including the gross receipts rather than the defendant's commissions, the Court, speaking through Judge McEntee of the First Circuit, asserted:

"* * * The district court reasons that defendant is not merely including his profit since he has to pay certain expenses out of the commissions. This is strictly true but nothing follows from it. It is equally true that the restaurant proceeds over and above the price of the food must be further reduced by overhead such as rent and salaries. But if the fact that the commissions do not represent pure profit leads to the conclusion that only the commissions should be considered in determining qualification for the exemption, then the cost of food in the restaurant should also be excluded on the same basis. Yet no one suggests this conclusion for the fundamental reason that proceeds and profits are not the same thing." 405 F.2d 159.

In Wirtz v. First National Bank and Trust Co., *supra*, the landlord's wholly-owned subsidiary received a "management fee" of $30,000 per annum on gross earnings from rentals of over $2,000,000. The Court of Appeals for the Tenth Circuit computed the gross rentals in determining the subsidiary's gross volume of sales." 365 F.2d 644, 645. Cf. Wirtz v. Columbian Mutual Life Insurance Co., *supra*.

We believe the *Jernigan* case, *supra*, represents the better view and the correct application of the Congressional intent. Accordingly, we conclude that gross rentals from defendant's management activities must be included in determining its "annual gross volume of sales made or business done."

### ISSUE

"Are the business activities of [defendant] * * * particularly those related to the management of various buildings, related activities performed through unified operation or common control for a common business purpose so as to constitute an enterprise within the meaning of Section 3(r) of the * * * Act * * *?" [Stip. ¶ 1]

Section 3(r), as added to the Act by the 1961 Amendments, *supra*, defined as follows:

"'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor * * *." 29 U.S.C. § 203(r) (1958 Ed. Supp. V).

■ The statutory definition of enterprise requires the existence of three elements: (1) related activities, (2) unified operation or common control, and (3) a common business purpose. Wirtz v. Savannah Bank & Trust Co. of Savannah, *supra*, 362 F.2d 859.

As stated in the Regulations:

"* * * the answer to the question whether particular activities are 'related' or not, will depend in each case upon whether the activities serve the business purpose of the enterprise, or whether they serve a separate and unrelated business." 29 C.F.R. § 779.-206(b).

Defendant's relevant business includes the management of buildings. [Stip. ¶ 204] Its "Contract for Management" mandates it "[t]o hire, discharge and supervise all labor and employees required for the operation and maintenance of the premises. * * *" [Stip.Exh. 1, p. 2] The activities of such laborers are related to defendant's business.

Paragraph 303 of the Stipulation, quoted *supra* at page 3 et seq., establishes defendant's "common control." Cf. 29 C.F.R. § 779.221. Likewise, the ac-

tivities of the employees in each building serve a "common business purpose." Cf. 29 C.F.R. § 779.213.

Defendant challenges treating the various buildings as "establishments" of defendant. It argues:

"[Plaintiff] has ignored the absolute necessity of establishing each of these various buildings as 'establishments' of the 'enterprise' of [defendant]. Nothing in the Stipulation or in the facts suggest [sic] that [defendant] maintains a distinct place of business anywhere else except at the Grant Building." [Defendant's Brief, p. 10]

The Act does not define the term "establishment." However, the term has been judicially construed to mean "a distinct physical place of business." Phillips Co. v. Walling, 324 U.S. 490, 496, 65 S.Ct. 807, 810, 89 L.Ed. 1095, 157 A.L.R. 876 (1945). Accord: 29 C.F.R. § 779.23. This construction was not modified by more recent amendments to the Act. Wirtz v. Savannah Bank and Trust Co. of Savannah, *supra*, 362 F.2d 863.

By its contract with the various buildings, defendant is in the "business" of managing the buildings' janitorial services. Necessarily these must be performed in the building. Therefore, each building becomes one of defendant's "places of business."

Defendant argues:

" * * * if the buildings themselves are to be considered part of [defendant's] 'enterprise', then how can the government avoid including the building owners as part of that enterprise? But to try to do so would have been ludicrous, for it is apparent * * * that these various owners of the buildings are not acting together with each other and [defendant] for a 'common business purpose'. It is even possible that one owner does not know which other buildings [defendant] are [sic] managing for others."

[Defendant's Brief, p. 10]

The flaw in this analysis is the correlation of "enterprise" to "buildings"; whereas the statutory definition defines "enterprise" as "related activities." 29 U.S.C. § 203(r) (1958 Ed. Supp. V). Moreover, as the Regulations assert: " * * * the term 'enterprise' is roughly descriptive of a business rather than of an establishment or of an employer although on occasion the three may coincide." 29 C.F.R. § 779.203(b).

■ We are confronted here with a situation analagous to the case of a chain's store in a supermarket. Treating the entire supermarket as the owner's "establishment" does not preclude treating the particular store as one of the chain's "establishments" and the activities conducted in that "establishment" as part of the chain's "enterprise." Cf. 29 C.F.R. § 779.225.

### ISSUE

"Among the persons * * * employed at the various buildings managed by the defendant, are there at each building at least two persons performing activities which constitute engagement in interstate commerce or in the production of goods for commerce, within the meaning of the Act?" [Stip. ¶ 4]

The Stipulation refers to the activities of various employees in each building. [Stip. ¶ 501] these activities may be categorized as follows: 1) operating elevators carrying mailmen delivering mail and parcel post and carrying delivery men making deliveries, a "portion" of which originate outside Pennsylvania; 2) operating elevators carrying freight to and from the building, a "portion" of which involved interstate shipments; and 3) using in connection with maintenance work "goods * * * including such goods as soap, detergent, waxes, and light bulbs," originating outside Pennsylvania. [Stip. ¶¶ 501, 502]

■ In determining the coverage of elevator operators in office buildings, absent evidence that tenants are themselves engaged in producing goods for inter-

state commerce, the mere fact that elevator operators convey mailmen and deliverymen carrying items in interstate commerce does not suffice to bring the elevator operators within the coverage of the Act. 10 East 40th Street Building, Inc. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, 161 A.L.R. 1263 (1945).[7]

■ With reference to the janitors' use of "soap, detergent, waxes, and light bulbs" which have moved in interstate commerce, two features are important:

1) The term "goods," as defined in Section 3(i) of the Act, " * * * does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof, other than a producer, manufacturer, or processor thereof." 29 U.S.C. § 203(i).

(2) As stated in 29 C.F.R. § 779.240 (a):

" * * * the mere fact that employees * * * are using machinery, equipment, work tools, and the like, which may have been moved in or produced for commerce, does not mean that they are handling, selling, or otherwise working on 'goods' that have been moved in or produced for commerce within the meaning of Section 3(s)."

■ We conclude that there have not been two employees in each building engaging in interstate commerce.

### ISSUE

"Prior to February 1, 1967, was defendant's business an enterprise as defined in Sections 3(r) and 3(s) (3) of the Act as it then read?" [Stip. ¶ 7]

We have heretofore concluded that the activities of the employees in question constituted part of the "enterprise" of defendant within the meaning of Section 3(r). Section 3(s), as supplied by the 1961 Amendments, *supra*, provided:

" 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

$$* \quad * \quad * \quad * \quad * \quad *$$

"(3) any establishment of any such enterprise * * * which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000." 29 U.S.C. § 203 (s) (1958 Ed. Supp. V).

■ We have heretofore concluded that the "annual gross volume of sales" of defendant's enterprise requires a computation of the gross rental receipts for the various buildings. However, we have also heretofore concluded that at none of the buildings did defendant have two or more "employees engaged in commerce or in the production of goods for commerce." None of the employees were covered under the 1961 Amendments to the Act.

---

7. Plaintiff relies on Wirtz v. Columbian Mutual Life Ins. Co., *supra*, as authority for treating the employees in the case at bar as engaged in interstate commerce. In the *Columbian* case, the Secretary sought coverage for elevator operators and building porters. The Court sustained coverage of these employees under the "enterprise" doctrine on the basis of the porters' activities, described as follows:

" * * * The building does not have a freight elevator so that freight and express shipments are lowered into the basement during the day by a sidewalk lift operated by porters, signed for by them, and then at night these shipments are carried by porters, on the passenger elevators, to the offices of the tenants. A substantial part of these shipments have moved in interstate commerce." 246 F.Supp. 208.

In the case at bar, only employees at the Buhl Building "personally" handle the delivery of parcels. [Stip. ¶ 501] Elsewhere, they merely operate elevators carrying deliverymen. [Id.] Moreover, the Stipulation does not establish that a "substantial part" of these parcels had originated outside Pennsylvania. The *Columbian* case is inapposite.

## ISSUE

"Does [defendant] employ anywhere two or more persons performing activities which constitute engagement in interstate commerce or in the production of goods for commerce, within the meaning of the Act, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce?" [Stip. ¶ 5]

The Stipulation asserts:

" * * * a number of [defendant's] employees employed in its home office were regularly and recurringly engaged in preparing and handling correspondence, remittances, billings, advertising materials, and other miscellaneous goods, including profit and loss statements, governmental reports, and real estate leases, a portion of which were transmitted to points outside the Commonwealth of Pennsylvania, and regularly and recurringly using channels and facilities of interstate communication such as telephones, telegraph, and United States mail in corresponding and communicating with persons and concerns located outside the Commonwealth of Pennsylvania." [Stip. ¶ 211]

Section 3(b) of the Act defines "commerce" to include " * * * communication among the several States or between any State and any other place outside thereof." 29 U.S.C. § 203(b). Employees engaged in these activities are engaged in interstate commerce. Mitchell v. Joyce Agency, Inc., 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740 (1955), rev'g 211 F.2d 241 (7 Cir. 1954), rev'g in part 110 F.Supp. 918 (N.D.Ill.1953); Mitchell v. Kroger Co., 248 F.2d 935 (8 Cir. 1957).

 We conclude that defendant employs two or more persons performing activities which constitute engagement in interstate commerce.

## ISSUE

"After February 1, 1967, was defendant's business an enterprise as de-

fined in Section 3(r) and 3(s) (1) of the Act as amended?" [Stip. ¶ 8]

 We have heretofore determined that defendant's operations constituted an "enterprise" within the meaning of Section 3(r) of the Act, as amended in 1961. The 1966 Amendments, supra, note 6, made no relevant alteration in the language of Section 3(r). Therefore, defendant's relevant activities have also constituted an "enterprise" since February 1, 1967.

The 1966 Amendment, *supra*, adopted a new Section 3(s), which provides:

" 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

"(1) during the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 * * and beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 * * *." 29 U.S.C. § 203(s) (1964 Ed. Supp. II).

It is not disputed that defendant's enterprise "has employees engaged in commerce." Based on a prior conclusion, it is likewise clear that defendant's "annual gross volume of sales made or business done" exceeds the statutory minimums.

We conclude that after February 1, 1967, defendant's business constituted an "enterprise" within the meaning of the Act.

## ISSUE

"If there is liability under the Act to any of the employees of any of the buildings managed but not owned by [defendant], is it the liability of the defendant or is it the liability of the owner of the buildings? " [Stip. ¶ 3]

Section 6 of the Act imposes liability for payment of the minimum wage and overtime pay on the "employer," 29 U.S.C. §§ 206, 207. We have heretofore noted that defendant is the "employer" within the meaning of the Act; and thus its liability is clear. None of the building owners are parties to this action. Accordingly, any observation we might make regarding their own potential liability would not be dispositive of an issue not properly within the ambit of the instant action. Cf. Asselta v. 149 Madison Ave. Corp., 65 F.Supp. 385 (S. D.N.Y.1945), aff'd 156 F.2d 139 (2 Cir. 1946), aff'd 331 U.S. 199, 67 S.Ct. 1178, 91 L.Ed. 1432, 169 A.L.R. 1293 (1947), modified on other grounds 331 U.S. 795, 67 S.Ct. 1726, 91 L.Ed. 1822 (1947).