**W. J. USERY, Jr., Secretary of Labor, Plaintiff,**

v.

**MOHS REALTY CORPORATION, a corporation, doing business as Ivy Inn Motor Hotel, and GNH, Inc., a corporation, doing business as Ivy Inn Restaurant, Defendants.**

**No. 76–C–14.**

United States District Court, W. D. Wisconsin.

Nov. 16, 1976.

Herman Grant, Regional Sol. of U. S. Dept. of Labor by Mark L. Shapiro, Chicago, Ill., for plaintiff.

Bakken & Feifarek by Paul S. Taylor, Madison, Wis., for defendant Mohs Realty Corp.

Johnson, Bieber & Swingen by Daniel G. Sandell, Madison, Wis., for defendant GNH, Inc.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil action brought by the Secretary of Labor under § 17 of the Fair Labor Standards Act (hereinafter referred to as the "Act"), 29 U.S.C. § 217 (1975), to enjoin defendants from violating its minimum wage and overtime provisions and to require the payment of back wages to defendants' employees. The Secretary asserts that defendant Mohs' motor inn operation and defendant GNH's adjoining restaurant and banquet facilities are subject to the Act's "enterprise" coverage provisions, 29 U.S.C. § 203(s)(1), because the component activities are "related" and "performed through unified operation or common control for a common business purpose" so as to constitute a single enterprise within the meaning of 29 U.S.C. § 203(r) (1975).[1] The defendants contend that the motor inn operation and adjoining restaurant and banquet facilities are not a single enterprise under § 203(r) and that neither of the two operations when taken alone has a sufficient annual gross volume of sales to subject it to the enterprise coverage provisions of the Act.

---

1. 29 U.S.C. § 203(r) provides in pertinent part as follows:

    (r) "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements . . . .

    29 U.S.C. § 203(s)(1) provides in pertinent part:

    (s) "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which—

    (1) . . . beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). . . .

Defendant GNH has moved for summary judgment,[2] arguing that GNH and Mohs were not a single enterprise under § 203(r) and that GNH did not come within the enterprise coverage provisions of § 203(s)(1) when considered alone. Defendant Mohs has moved for summary judgment, arguing essentially the same themes as GNH. In response to these motions, the plaintiff has moved for partial summary judgment on the ground that the uncontroverted facts show that the defendants are and have been since May 22, 1972, a single enterprise within the meaning of § 3(r) of the Act, 29 U.S.C. §§ 201 *et seq.* (1975).

On the basis of the affidavits, stipulations, answers to interrogatories, and responses to requests for admissions and requests for the production of documents submitted by the parties in support of their various motions, I find that there is no genuine issue as to the material facts set forth hereinafter under the heading "Facts."

*Facts*

Defendant Mohs owns and operates the Ivy Inn Motor Hotel in Madison, Wisconsin. The Ivy Inn is a two-story building containing motel rooms, a restaurant, cocktail lounge, and banquet rooms. From 1957 to 1963, Mohs itself operated all the motel hotel facilities. From 1963 to 1972, Mohs continued to operate the motel and banquet facilities but leased the restaurant and cocktail lounge for operation by lessees. These lessees were individuals not associated with GNH, Inc.

On May 22, 1972, Mohs leased the restaurant, cocktail lounge, and banquet facilities and equipment (including the stove, refrigerator, dishwashers, furnishings, fixtures, utensils, barware, chinaware, glassware, silverware and other items) to GNH. GNH does business as the "Ivy Supper Club and Lounge." The original term of the lease was July 1, 1972, to June 30, 1975, with an

extension thereafter on a year-to-year basis which is now in effect.

The lease contains the following pertinent terms:

A. Under paragraph IV(D), GNH shall operate a restaurant and bar on the demised premises although the lease does not provide that such a use shall be the exclusive use. However, because of the physical layout of the building and the lease requirement that a bar and restaurant be installed on the leased premises, it would be difficult if not impossible to use the leased premises for any additional purpose.

B. GNH must keep the restaurant open during the breakfast, lunch, and dinner hours seven days a week under paragraph V(R). Further, GNH must keep the bar open during the lunch hour and during the early and late evening hours seven days a week. There is no explicit statement in the lease that these hours are designed for the convenience of the motel guests. The bar and restaurant may be kept open for more than these minimum hours.

C. GNH shall "not refuse to accommodate patrons of the Ivy Inn Motor Hotel in its facilities at any time during its normal hours of operation" although GNH must operate its facilities so as to provide at least one bar area and one restaurant facility for the general public during the hours described in B above.

D. GNH shall "not retain any employees . . . whose conduct shall jeopardize the name and reputation of the PREMISES and more particularly the Ivy Inn Motor Hotel." Mohs has the right to insist upon the correction of such conduct or the immediate discharge of the GNH employee engaging in such conduct if it is not corrected.

E. GNH pays ten percent of its gross sales as monthly rent to Mohs. Mohs has the right to examine GNH's books of account for this purpose upon reasonable notice.

---

2. The stated ground for the motion for summary judgment is that "the complaint fails to state a claim upon which relief can be granted." But the motion itself is accompanied by an affidavit, and it is plain that defendant relies on factual matters not alleged in the complaint.

F. Motel guests can charge food or drinks on their room bills. In general, Mohs collects cash for these charges and remits it to GNH although Mohs does not guarantee payment for unpaid room service bills. Room service deliveries are made only by employees of GNH.

G. Mohs retains the right to maintain the pictures in the bar and restaurant and to remove them at any time at its option. GNH is not to clean the pictures.

H. Mohs is required to provide background music in the restaurant, banquet rooms and bar. Also, Mohs must provide trash removal service. GNH is required to pay Mohs one-half of the cost of these services.

I. GNH may not change the decor in the restaurant, banquet rooms, or cocktail lounge without the prior approval of Mohs and Mohs has the right to insist that the decor in the restaurant, banquet rooms, and cocktail lounge be in the same style as utilized in the motel.

J. Customers of all parts of the motor inn (restaurant, lounge, banquet facilities and motel rooms) share a common, undifferentiated parking lot. Customers may park in any part of the lot, as there are no designated areas for motel guests as distinct from restaurant customers although under some circumstances Mohs may set aside up to fifty percent of the parking spaces for their overnight guests. GNH's employees are prohibited from parking in the lot.

K. The liquor license of the cocktail lounge runs with the premises and is held by the lessee as an incident of the lease. The license was issued to GNH's predecessor as lessee and transferred to GNH as lessee. In order to protect Mohs, GNH pledges all of its stock to secure and guarantee the continued maintenance of the license on the cocktail lounge premises. In the event of any default or termination of the lease, GNH agrees to surrender and transfer the license to Mohs.

L. GNH also covenants not to compete in the restaurant, catering or bar business within fifteen miles from the Ivy Inn during the term of the lease or for ninety days thereafter. The express purpose of this covenant is to ensure that the liquor license remains on the premises and "to protect the Lessor [Mohs] from the loss of banquet and party business which it is presently doing in its facilities being leased hereunder to the Lessee [GNH]."

M. GNH may not assign or sublet the lease without Mohs' permission.

N. In accordance with the lease provisions requiring that signs, names and other advertising "identify the leased facilities as being part of the Ivy Inn Motor Hotel," the motor hotel's advertising, promotions and guest information treat the restaurant, banquet facilities and cocktail lounge as an integral part of the motor hotel operation. For example, a sign with the following words on it is presently located on the front lawn of the motor hotel:

IVY

DINING—COCKTAILS

INN

A sign reading "IVY INN DINING" is located above the dining room window on the outside of the building, and a sign reading "IVY INN LOUNGE" is located above the cocktail lounge window outside the building. Signs reading "IVY INN" are located on the glass doors to the restaurant and cocktail lounge from the central lobby. Further, GNH must "retain and utilize the existing names of the facilities leased" (i. e., "Ivy Inn Supper Club and Lounge," "Ivy Inn Bar," "Ivy Inn Restaurant").

No officer or director of Mohs has been or is an officer or director of GNH or vice versa. Nor is there any common ownership of stock in and between Mohs and GNH. Further, GNH and Mohs use different accounting firms for bookkeeping purposes.

The Ivy Inn Motor Hotel has a telephone number and telephone listing in the Madison telephone directory separate and apart from the telephone number and telephone listing of the Ivy Supper Club and Lounge.

However, motel guests who want room service place their calls toll-free through the motel switchboard to the restaurant, the motel front desk, and other guest rooms, whereas calls to locations outside the Ivy Inn premises are not toll-free.

Although not required by the lease, there are several promotional items which at least in part contain advertising language asserting the complementary nature of the services provided by GNH and Mohs.[3] An "Ivy Inn" matchbook states that the "Ivy Inn Motor Hotel" has air-conditioned, fireproof rooms, dining and banquet rooms and cocktail lounge. A map of the area around the "Ivy Inn" lists "Ivy Inn Features and Services" including motel rooms, cocktail lounge, dining room, banquet facilities and room service. A poster for the "Ivy Inn" sent to University of Wisconsin departments emphasizes the motel rooms, the party and convention rooms, cocktail lounge and delightful dining.

Guest stationery placed in the motel rooms has an "Ivy Inn" logo, an "Ivy Inn Motor Hotel" letterhead, and an invitation to "Try our banquet and convention facilities, cocktail lounge [and] colonial dining room." As Ivy Inn picture postcard describes the Ivy Inn Motor Hotel as "complete with dining and banquet facilities, [and] cocktail lounge." In addition, a guest brochure shows a photograph of the entire motor hotel, including the restaurant and cocktail lounge, above the words "Ivy Inn." The brochure states that "The Ivy Inn with its Georgian Colonial design and relaxed gracious atmosphere welcomes you," and contains photographs and verbal descriptions of the lobby, cocktail lounge, dining room ("Dining at the Ivy Inn, your home away from home"), banquet rooms and motel rooms.

The collective references "we," "us," and "our" are used repeatedly in this advertising material. For example, the "Notice to Guests" of the "Ivy Inn Motor Hotel" posted in the motel rooms advises of smoking regulations and room rates and asks guests to "Please help us keep our license—No soliciting, . . . no pets in our restaurant (pets are not allowed in rooms)."

A room service menu placed in the motel rooms lists "The Kerls" (the officers of GNH) as the hosts of the "Ivy Inn" banquet facilities.

In its other advertising, the "Ivy Inn" has always been treated as a unit consisting of motel, restaurant, cocktail lounge and banquet facilities. Celebrating the 10th anniversary of the "Ivy Inn" in a 1967 newspaper advertisement, Bruce B. Mohs (manager, secretary, director, and shareholder of Mohs Realty Corporation) and Lyle W. Fish the lessee of the restaurant and cocktail lounge at that time) tell readers "in our sincere appreciation we invite you to help us celebrate our 10th Anniversary." This advertisement lists motel rooms, banquet rooms, restaurant and cocktail lounge as features of the "Ivy Inn."

Several guidebooks for travellers also treat all the facilities at the Ivy Inn as a unit. However, the defendants did not participate in the actual writing of these books.

In general, both GNH and Mohs pay their respective employees from their respective incomes and employees work for either GNH or Mohs but not both. However, Mary Lulling, the daughter of GNH's president, has worked concurrently for both GNH and Mohs.

---

**3.** Defendant Mohs asserts that these items are not relevant since they predate 1972 when GNH was formed or were not circulated to the general public. The former fact can cut against the defendants, though, since it is evidence for the proposition that GNH was formed to give the pre-1972 hotel/restaurant/bar operation the appearance of operating as two separate entities although, in reality, they may have operated as advertised after 1972. Also, the fact that many of these items could be obtained only at the restaurant does not negate their evidentiary value in assessing the intentions and perceptions of the Ivy Inn management.

The annual gross volume sales of Mohs has been as follows for the calendar years 1972–1975:

| | | |
|---|---|---|
| 1972 | – | $219,736.00 |
| 1973 | – | 197,360.00 |
| 1974 | – | 198,253.00 |
| 1975 | – | 196,730.00 |

Gross annual sales for GNH have been as follows:

| | |
|---|---|
| 3/1/72–4/30/73 | $136,897.00 |
| 3/1/73–4/30/74 | 173,004.00 |
| 3/1/74–4/30/75 | 181,174.00 |
| 3/1/75–4/30/76 | 133,877.00 |

A portion of GNH's business is attributable to guests staying at the Ivy Inn Motor Hotel. However, the exact percentage of GNH's business attributable to this source is not determinable from the business records kept by Mohs and GNH without making assumptions concerning the average number and type of meals eaten at the restaurant by the motel guests.

*Opinion*

■ The plaintiff asserts and the defendants deny that the motel and restaurant businesses are subject to the provisions of the Act because they constitute a single enterprise as defined in § 3(r) of the Act, 29 U.S.C. § 203(r) (1975). Whether several businesses constitute a single enterprise for the purposes of the Act, is a question to be resolved by probing the entire factual situation rather than looking for any particular factual phenomena. *Brennan v. Plaza Shoe, Inc.*, 522 F.2d 843, 846 (8th Cir. 1975).

■ The Act was passed to prevent the exploitation of workers who exist at the lowest-paid end of the labor market by providing the minimal standard of living necessary for their health, efficiency, and general well-being and by prescribing certain minimum standards for working conditions. "In applying the Act to the facts at hand, we must liberally construe it 'to apply to the furthest reaches consistent with congressional direction' in fulfillment of its humanitarian and remedial purposes."

*Brennan v. Plaza Shoe Store, Inc., supra*, at 846 *citing Mitchell v. Lublin, McGaughy & Asso.*, 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959) (non-professional employees of defendant held to be "engaged in commerce" as that term is used in 29 U.S.C. §§ 206, 207 (Supp.1975)). The purpose of the 1961 amendments to the Act—with which we are primarily concerned since §§ 203(r), 203(s)(1) were added in these amendments [4]—was further to invigorate and enlarge the scope of the Act. *Hodgson v. University Club Tower, Inc.*, 466 F.2d 745, 746 (10th Cir. 1972).

■ Whether the enterprise provision of the Act comprehends the factual pattern in this case described above depends upon whether the motel and restaurant are (1) related activities (2) performed for a common business purpose (3) through common control or unified operation. 29 U.S.C. § 203(r) (Supp.1975). The presence of each of these elements is necessary for a finding that GNH and Mohs are a single enterprise under § 203(r), *Hodgson v. Hatton*, 348 F.Supp. 895, 898–99 (S.D.Tex.1972), although there is considerable overlap in the nature of the facts which will support each of these elements. *See, e. g.,* the regulations promulgated by the Secretary of Labor on this subject (29 C.F.R. §§ 779.200–224 (1975)).

I. *Related Activities*

The statute uses the words "related activities" but contains no definition of the term. 29 C.F.R. § 779.205 (1975). The regulations appeal to the legislative history of the Act which supports the view that activities are related when they are the "same or similar" or when they are "auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising and other services." 29 C.F.R. § 779.206 (1975), *citing* Sen.Rep.No.145, 87th Cong., 1st Sess. 41 (1961), U.S.Code Cong. & Admin.News 1961, p. 1620.

---

4. Act of May 5, 1961, Pub.L.No. 87–30, § 2, 75 Stat. 65, *amending* 29 U.S.C. § 203 (1965) (codified at 29 U.S.C. §§ 203(p)–(s) (Supp.1975)).

Although such terms as "similar" and "auxiliary" are not very helpful, the regulations include two examples which provide some assistance. A retail store enterprise may engage in construction activities as an additional outlet for building materials which it sells. It may act as its own contractor in building its stores and related facilities. In these cases the construction and retail activities would be related. 29 C.F.R. § 779.206(b) (1975). However, where a company simply operates distinct retail and construction businesses, the construction activities would not be related to the retail activities and would constitute a separate business if operated independently and apart from the retail operation. *Id.* Another example provided by the regulations is that of a department store which sells a wide variety of retail goods. *Id.* § 779.207. The activity of selling one kind of goods and the activity of selling another kind of goods are deemed "related," presumably because the activity of selling was similar or the same despite the difference in the nature of the product sold. In reversing a district court's decision that a shoe store and dress shop were unrelated operations because they sold different products to different clienteles, the Eighth Circuit noted that " . . . legislative history and long-standing administrative rulings focus not on the variety of the goods that are sold, but rather on the similarity of the business operations, such as retail sales, in determining whether the activities are 're-lated.' " *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 847–48 (8th Cir. 1975).

The regulations also provide a list of auxiliary services that are considered related: (a) credit rating and collection services; (b) promotional activities including advertising, sign painting, display services, stamp redemptions, and prize contests; (c) maintenance and repair services of plant machinery and equipment including painting, decorating, and similar services; (d) store or plant engineering, site location and related survey activities; (e) detective, guard, watchmen, and other protective services; (f) delivery services; (g) the operation of employee or customer parking lots; (h) the recruitment, hiring and training activities, and other managerial services; (i) recreational and health facilities for customers or employees including eating and drinking facilities (note that employees primarily engaged in certain food service activities in retail establishments may be exempt from the overtime provisions under section 13(b)(18) of the Act if the specific conditions are met; see § 779.-388); (j) the operation of employee benefit and insurance plans; and (k) repair and alteration services on goods for sale or sold to customers.

29 C.F.R. § 779.208 (1975).

In the case at hand, providing food and bar service and providing overnight accommodations are clearly not the "same," and they are not strictly "similar" activities in terms of what is being provided. Such a superficial distinction was one basis for the finding in *Brennan v. Ashy*, 397 F.Supp. 1347 (W.D.La.1975), *appeal docketed sub nom., Dunlop v. Ashy*, No. 75–3405 (5th Cir. Sept. 8, 1975), that the activities of a restaurant and motel under the same roof were unrelated. However, the services are similar in the sense that they are provided to customers who have chosen to satisfy their complementary needs for food and shelter away from home. By having a bar and restaurant in the same building as the motel, the motel management is able to provide a full line of services to its transient customers. The two businesses are thus related in that they are a "department store" for complementary services rather than goods. This impression is reinforced by the advertising undertaken prior to 1972 representing Ivy Inn as a well-rounded facility, and numerous terms of the lease between Mohs and GNH.

The terms of the lease between Mohs and GNH also suggest that the restaurant and motel could be considered to be providing auxiliary services to one another. In the *Ashy* case, *supra*, the operations were held not to be auxiliary because the two businesses were not necessary adjuncts of each other. However, this test flies in the face

of the test adopted in several opinions of courts of appeals where the focus was on the operational interdependence of the businesses as indicated by all the facts. *See, e. g., Wirtz v. Savannah Bank*, 362 F.2d 857, 859–60 (5th Cir. 1973). In *Savannah Bank*, the renting of office space by a bank in a building partially occupied by the bank was held to be an operation auxiliary to the bank's main activities since the rental operations enabled the bank "to locate in a desirable downtown area, to provide space for future expansion, to improve the Bank's profit position, both from standpoint of revenue and taxes, and to strengthen the image of the Bank in the public eye." *Id.* at 861.

By the terms of the lease in this case, GNH must provide restaurant and bar service to motel patrons during certain hours, the restaurant's employees must not jeopardize the reputation of the motel and Mohs can insist upon their discharge if they do act improperly, GNH must provide room service, Mohs must bill their patrons for these services on GNH's behalf, and Mohs controls the decor of the restaurant to a great extent. In addition, the telephone system between the motel room and the restaurant, and the advertising describing the motel and restaurant as a unit, support the view that GNH and Mohs are providing mutually supportive services. From these facts, the restaurant and bar services are clearly supportive of and auxiliary to the motel business.

Similarly, the motel business can be considered supportive of the restaurant business. It is clear that GNH receives numerous aids from motel personnel including maintenance and telephone services. The fact that the operations occur under one roof also suggests their auxiliary nature. *Wirtz v. Savannah Bank & Trust Co.*, 362 F.2d 857, 860 (5th Cir. 1966). Further, the Ivy Inn Restaurant derives an indeterminate portion of its business from motel patrons.

Applying the test of actual operations, the similarity and mutually auxiliary nature of the services provided by Mohs and GNH compel a finding that the activities of the two businesses are related within the meaning of 29 U.S.C. § 203(r) (Supp.1975).

## II. *Common Business Purpose*

■ "A common business purpose" is also a term used but not defined in the statute or the regulations. However, this requirement is closely akin to the "related activity" requirement of the enterprise concept. *Wirtz v. Columbian Mutual Life Insurance Co.*, 380 F.2d 903, 907 (6th Cir. 1967); *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 848 (8th Cir. 1975). Although a common profit motive alone is not enough to establish a common business purpose, *e. g., Hodgson v. University Club Tower, Inc.*, 466 F.2d 745, 747 (10th Cir. 1972), a common business purpose is present in the instant case since the motel and restaurant business operations furthered each other "from the standpoint of facilitating the internal operation of the business and from the standpoint of establishing a favorable public image." *Wirtz v. Columbian Mutual Life Insurance Co.*, 380 F.2d 903, 907 (10th Cir. 1967). The purpose of facilitating the operation of the motel/restaurant/bar complex and of establishing the public image of a full service unit was "shared in a like manner" by both GNH and Mohs as evidenced by the facts discussed with respect to the "related activities" requirement above. *Hodgson v. University Club Tower, Inc.*, 466 F.2d 745, 747 (10th Cir. 1972).

In *Wirtz v. First National Bank & Trust Co.*, 365 F.2d 641, 644 (10th Cir. 1966) the court looked at a wide range of facts in determining that a banking operation and a management company in the business of operating a building which was owned and partially occupied by the bank had a common business purpose. The court found that the following facts indicated a common business purpose:

1. The bank could engage only in banking activities.

2. The building was the base of the bank's operations and allowed it to operate in a desirable location.

3. The building was an investment and asset of the bank.

4. The performance of the management company was necessary and essential to the condition of the banking business.

5. The management company operated the building as an integral unit.

6. The operation of the office building provided room for future bank expansion.

7. The bank realized some economies from the operation of the office building.

*Id. See, also, Hodgson v. Eunice Superette, Inc.*, 368 F.Supp. 639, 641–42 (W.D.La.1973) (slaughterhouse with wholesale and retail sales operation and grocery store on same street although one mile apart had common business purpose in that the wholesale store supplied a portion of the grocery's meat needs); *Shultz v. Morris*, 315 F.Supp. 558, 562 (N.D.Ala.1970) (three grocery stores were held to have a common business purpose in that there was a shared profit motive, there was one franchise for all three stores, and one license fee on the combined volume of the three stores).

In the instant case, the following facts suggest that there is a common business purpose between GNH and Mohs:

1. The same building is the base of activities for the restaurant and the motel operations and allows both to operate in a more favorable environment.

2. The building is an investment and asset of Mohs the value of which, in part, depends upon the profitability of the restaurant and bar business.

3. The lease between Mohs and GNH requires GNH to operate the restaurant in Mohs' interest in numerous respects.

4. Operation of the restaurant and bar by GNH is necessary and essential to the provision of a full line of services to the motel patrons.

5. Operation of the motel attracts some business to the restaurant, although apparently an indeterminate amount.

6. The motel and restaurant are advertised as an integral unit as evidence by the signs appearing on the premises.

7. The advertising which was produced prior to 1972 indicates that the motel and restaurant were unambiguously presented to the public as a single entity.

8. The restaurant and motel realize certain economies by operating in the same building.

The only factors suggesting noncommonality of business purpose between GNH and Mohs are the fact that the corporate structures of the two businesses are distinct, and the fact that the overlap in actual customers of the restaurant/bar and those of the motel, while indeterminate, is arguably modest. However, these factors fail to counterbalance the factors indicating that the motel and restaurant/bar operations further each other by their mutually supportive internal operations and the image they present to the public.

III. *Common Control or Unified operation*

Finally, the activities of GNH and Mohs must be performed "either through unified operation or common control." 29 U.S.C. § 203(r) (1975). These terms have no fixed technical or legal meaning. Whether the related activities of GNH and Mohs were performed through common control or unified operation must be determined from all of the facts of the case in light of the overall legislative intent and history of the Act. 29 C.F.R. § 779.216 (1975).

The regulations under § 203(r) clearly provide that only common control or, in the alternative, unified operation need be demonstrated to meet this requirement. 29 C.F.R. §§ 779.215(a), 779.219 (1975).

Although there is virtually no decisional law on the meaning of the term "unified operations" [5] the regulations are

---

**5.** Most cases on this third of the § 203(r) "enterprise" definition go off on the "common control" branch of the requirement and thus do not discuss the question of unified operations. *See, e. g., Brennan v. Plaza Shoe Store, Inc.*,

522 F.2d 843, 848 (8th Cir. 1975); *Wirtz v. Columbian Mutual Life Insurance Co.*, 380 F.2d 903, 906 (6th Cir. 1967); *Wirtz v. First National Bank & Trust Co.*, 365 F.2d 641, 644 (10th Cir. 1966); *Hodgson v. Eunice Superette, Inc.*, 368

somewhat helpful. The following excerpts are the most germane:

. . . The term "unified operation" thus includes a business which may consist of separate segments but which is conducted or operated as a unit or as a single business for a common business purpose.

29 C.F.R. § 779.217 (1975). Further the separate segments

. . . may accomplish such unification through arrangements, franchises, grants, leases, or other arrangements which have the effect of aligning or integrating the activities of one company with the activities of others so that they constitute a single business or unified business system. Whether in any particular case the activities are performed through "unified operation" and have the effect of creating a single enterprise, will depend upon all the facts, including the manner in which the activities are performed, the agreements and arrangements which govern their performance, and the other relationships between the parties, considered in the light of the statutory provision and the legislative intent.

*Id.* § 779.218 (citations omitted).

In one of the few cases where the issue of unified operations was considered, the district court held there was no unified operation of a hotel and two apartment houses since the hotel and the two other buildings were separated by several miles, had no common bookkeeping, central purchasing, or mutual services, and the operation of the hotel and apartment houses was not mutually supportive. *Hodgson v. University Club Tower, Inc.*, 350 F.Supp. 817, 820 (N.D. Okl.1971).

Thus the regulations (especially 29 C.F.R. § 779.220 (1975) ) and cases suggest several factors which tend to indicate that certain activities are performed through unified operations. That GNH and Mohs effectuated their related activities through unified operations is indicated by the following facts:

1. Both units operate under the trade name "Ivy."

2. Both units are housed in the same building.

3. Both units use a common entryway and common floorspace.

4. A substantial portion of the equipment used by GNH is leased from Mohs directly.

5. Room service charges are included on motel customers' motel bills.

6. The two segments appear to the persons utilizing the services as one business.

7. The on-site advertising of the restaurant and motel represents the two businesses as a single business.

8. The advertising in brochures and leaflets produced and distributed prior to 1972 clearly represented the two businesses as one entity.

That GNH and Mohs are separately owned and that each may retain control as to some or all of its activities do not override the weight of the factors listed above. 29 C.F.R. § 779.220 (1975). In fact, the unified operation test contemplated situations where there are a number of formally separate companies. *Id.* § 779.219.

■ I hold that the above-mentioned activities performed by GNH and Mohs are related and performed through a unified operation for a common business purpose as set forth in 29 U.S.C. § 203(r) (1975) and thus these activities constitute a single enterprise subject to the enterprise coverage provisions set forth in 29 U.S.C. § 203(s)(1) (1975).[6]

*Order*

Upon the basis of the entire record and for the reasons stated in the above opinion, it is hereby ordered:

F.Supp. 639, 642 (W.D.La.1973); *Shultz v. Morris*, 315 F.Supp. 558, 563 (N.D.Ala.1970).

**6.** Plaintiff's motion for partial summary judgment does not reach the question whether this "enterprise" meets the coverage provision of § 203(s)(1), and I express no opinion on that question.

(1) that defendants' motions for summary judgment are denied;

(2) that plaintiff's motion for partial summary judgment is granted; and

(3) that it is adjudged that defendants are, and since May 22, 1972, have been, an enterprise within the meaning of Section 3(r) of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*).