Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Appellant,

v.

Kenneth C. WEBER, individually and d/b/a White House Cafeteria, Appellee.

No. 82–1871.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1983.

Decided Jan. 3, 1984.

---

T. Timothy Ryan, Jr., Sol. of Labor, Beate Bloch, Associate Sol., Ruth E. Peters, Counsel for Appellate Litigation, Lauriston H. Long, Atty., U.S. Dept. of Labor, Washington, D.C., Tedrick A. Housh, Jr., Regional Sol., Kansas City, Mo., for appellant.

Kent A. Higgins, Bismarck, N.D., for appellee.

Before ROSS, McMILLIAN and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

The Secretary of Labor filed suit against Kenneth C. Weber individually and doing business as White House Cafeteria for violations of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–19 (FLSA). Though the White House Cafeteria's annual gross volume of sales was less than the $250,000 threshold provided by 29 U.S.C. § 203(s) for coverage of a business under the FLSA, the Secretary alleged that the cafeteria was covered under the "enterprise" provisions of 29 U.S.C. § 203(r) as a leased department of the White Drug Store, whose volume of business was sufficient to come under the FLSA. The District Court for the District of North Dakota held that the White House Cafeteria was not a leased department of the White Drug Store, and therefore was not subject to coverage under the FLSA. The Secretary of Labor appealed. For the reasons stated herein, we affirm.

### Background

White Drug Enterprises (White Drug) operates a chain of 38 drugstores in five states. One of these drugstores is located in a shopping center in Bismarck, North Dakota, and has a cafeteria within the store which is the subject of this lawsuit. White Drug leased the store in March 1970, and on completing renovation of the structure opened a full-line drugstore on the site. The renovation of the facility included construction in the rear of the drugstore of a cafeteria, which always has been known as the White House Cafeteria. The drugstore, including the cafeteria, was designed according to White Drug specifications. This was not the only cafeteria White Drug operated. At least four other stores in the White Drug chain either have or at some time had cafeterias.

The defendant/appellee, Kenneth Weber, was the manager of the cafeteria in the Bismarck drugstore at its opening. At that time, the cafeteria was operated by the drugstore and Weber was an employee of White Drug. This arrangement continued until August 1971, when Weber leased the cafeteria from White Drug and commenced operating it as an independent business. The transition occurred without any interruption in service to the public or change in employees, menu or decor of the cafeteria.[1]

To a certain extent White Drug controls the hours of operation of the cafeteria. This is true because it is impossible for customers to enter the cafeteria other than through the drugstore. The cafeteria opens at 8:00 a.m., while the only part of the drugstore open at that time is the pharmacy. The rest of the drugstore opens at 9:00 a.m. This pattern has been followed since the drugstore's inception. While Weber has a passkey to the main entrance to the drugstore, he does not have the ability to turn off the main alarm system to the drugstore. The cafeteria closes at 5:00 p.m. and the drugstore closes at 8:00 p.m.

The cafeteria is located at the rear of the drugstore. The public cannot enter the cafeteria without walking through the drugstore. There are two entrances to the drugstore; the main entrance, which is 158 feet from the cafeteria entrance, and the side (mall) entrance, which is 58 feet from the cafeteria entrance. The entrance to the cafeteria itself is immediately adjacent to the pharmacy of the drugstore. The cafeteria is separated from the main area of the drugstore by a low split-rail fence.

Deliveries to the cafeteria and drugstore are made at the rear entrance. There is a doorbell which is used to signal both the cafeteria and drugstore. One ring indicates a delivery for the drugstore and three rings indicate a delivery for the cafeteria. If a delivery comes in for the cafeteria when it is closed, the drugstore personnel will answer the cafeteria's ring and bring in the delivery.

There are two intercom systems in the drugstore and cafeteria. One serves the entire drugstore, with a station in the cafeteria. A second intercom serving only the cafeteria was added by Weber after he leased the cafeteria.

On the front of the building there are three signs, one reading "White Drug," one reading "White House Cafeteria" and one reading "Sickroom Service" (a division of White Drug). At the extreme left appear the initials WD—the logo of White Drug.

There is some evidence that the public has treated the drugstore and cafeteria as one business. For instance, cafeteria cus-

---

1. The lease from White Drug to Weber contained, among others, the following provisions:

The parties hereby agree as follows:

.        .        .

2. It is mutually understood and agreed that the leased premises shall be used and occupied by said Tenant as a cafe, and in the use thereof Tenant shall comply with all applicable laws, ordinances and government regulations.

.        .        .

4. Tenant agrees to pay Landlord as rental for said premises and equipped cafe the sum of Sixteen percent (16%) for each month of gross sales, said rental to be computed and paid monthly on the 10th day of each month and based on the gross sales of the preceding month.

5. It is agreed that for the above rental payment the Landlord shall pay all utility bills used by Tenant in the operation of said cafe except the telephone bill.

6. The Tenant shall be responsible and pay its own payroll, payroll taxes, state sales tax, state and federal income tax, if any.

7. If ever it is necessary to repair any restaurant equipment, it is understood and agreed by the parties hereto that Tenant shall on each such repair occasion pay the first $100.00 of repair costs and the Landlord shall pay the balance, if any.

8. Tenant is hereby granted the right to use pots, pans, china, silver and flatware provided by the Landlord as part of this lease, however, it is understood that the parties hereto will inventory same and attach a copy of such inventory signed by both Landlord and Tenant to this lease agreement prior to the lease commencement date, and upon termination of this lease or any extension thereof, the Tenant agrees to replace or pay for any missing items contained in the original inventory above referred to.

9. The Tenant shall use the cafe trade name designated by the Landlord.

tomers have at times attempted to make checks payable to White Drug instead of to White House Cafeteria. This resulted in the posting of a sign in the cafeteria directing customers to make checks out to White House Cafeteria. There is also evidence that pharmacy customers were given coupons for free coffee while waiting for their prescriptions to be filled. The drugstore paid for these coupons at the full retail price.

Weber described the cooperation between the cafeteria and the drugstore as a "good neighbor thing." He consistently maintained throughout the trial that he was an independent businessman and, by implication, that areas of cooperation were the result of the physical layout of the building and not of unified operation or common control.[2]

### Applicable Law

The FLSA establishes uniform national minimum standards for various working conditions, including wages and hours, in businesses covered by its provisions. It is undisputed that, taken separately, the White House Cafeteria is not covered by the FLSA's provisions, since its total annual gross volume of sales is below the $250,000 minimum established by 29 U.S.C. § 203(s). Therefore, in order to bring the defendant under the FLSA, the Secretary argues that the cafeteria constitutes a "leased department" of the White Drug Store and is covered under the enterprise provisions of the statute.[3]

The FLSA sets out a three-part test for finding coverage under its enterprise provisions. As stated by this court in *Brennan v. Plaza Shoe Store, Inc.,* 522 F.2d 843 (8th Cir.1975): "The Act describes three elements which must coexist before the corporate defendants herein can be considered a single enterprise; (1) related activities; (2) unified operation or common control; and (3) a common business purpose." *Id.* at 846.

██ The determination of "enterprise coverage" under the FLSA is one that must

---

**2.** This is not a complete fact summary. Additional facts are mentioned in the course of this opinion as they become pertinent.

**3.** 29 U.S.C. § 203(r) reads in part:

(r) "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: *Provided,* That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments. . . .

The Department of Labor's regulations set out criteria for applying the enterprise provisions of the FLSA. In particular, 29 C.F.R. § 779.225(d) gives the following guidelines distinguishing an ordinary landlord-tenant relationship from a leased department:

(d) Whether, in a particular case, the relationship is such as to constitute the lessee's operation to be a separate establishment of a different enterprise rather than a "leased department" of the host establishment as described in the definition, will depend upon all the facts including the agreements and arrangements between the parties as well as the manner in which the operations are conducted. *If, for example, the facts show that the lessee occupies a physically separate space with (or even without) a separate entrance, and operates under a separate name, with his own separate employees and records, and in other respects conducts his business independently of the lessor's, the lessee may be operating a separate establishment or place of business of his own and the relationship of the parties may be only that of landlord and tenant. In such a case, the lessee's operation will not be regarded as a "leased department" and will not be included in the same enterprise with the lessor. . . .* (emphasis added).

be resolved on the facts of each case, but is nevertheless a question of law. Thus, the ultimate conclusions reached by the district court are not shielded by the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure. *Brennan, supra* at 846; *Shultz v. American Can Company-Dixie Products,* 424 F.2d 356, 360 (8th Cir. 1970).

### Analysis

■ The Secretary seeks to bring Weber's cafeteria under the statute by asserting that the cafeteria is a leased department of White Drug. While the Secretary has made as effective an argument as possible, given the facts of the case, the final control over the major business decisions of each entity rests in different hands. Therefore, we find that there is no unified operation or common control between White House Cafeteria and White Drug. Since this finding precludes application of the FLSA to Weber, we need not decide if the activities of the two entities are related or if they share a common business purpose.

The Secretary relies most heavily on *Usery v. Mohs Realty Co.,* 424 F.Supp. 20 (W.D.Wis.1976). That case involved a restaurant facility which was leased out by an adjoining motel. While the Secretary correctly notes many similarities between the leasing arrangement in *Mohs* and the case at bar, several crucial elements present in that case are not present here. For instance, in *Mohs* the lessor/owner of the restaurant facility and adjoining motel retained control over the hiring and firing policies of the restaurant. The restaurant was required to allow hotel guests to charge meals to their hotel bills. Moreover, the restaurant was specifically required to maintain set minimum hours of operation. *Id.* at 23–24. Weber is not subject to such limitations. Also, in *Mohs* the restaurant and motel were extensively advertised and represented as one business. Here, except for a listing in the "white pages" of the local telephone directory, occasional newspaper advertising by the drugstore that included references to the cafeteria, and the

presence of the White Drug logo on the cafeteria trays, there is no overt pattern of promotion. representing the two entities as being part of the same business. The fact that the architectural design of the facility inevitably results in an association of the two businesses together in the public mind is not sufficient to bring about enterprise coverage under the FLSA; physical proximity alone is not enough. *Dunlop v. Ashy,* 555 F.2d 1228, 1231 (5th Cir.1977). As pointed out by the court below, many of the facts urged by the Secretary as showing a leased department operating under unified operation or common control are also consistent with an ordinary landlord-tenant arrangement. The rental arrangement, based on a percentage of gross sales, is similar to a provision in the drugstore's primary lease from the shopping center, and is not uncommon in commercial settings. Likewise, inclusion of utilities in the rent is consistent with a landlord-tenant relationship. That provision and many of the other facts stressed by the Secretary are a product of the physical setup of the facility, not of common control or unified operation.

Some cooperation is necessary between two businesses operating in confines as close as these, but it does not necessarily constitute unified operation. All basic business decisions concerning the cafeteria are made by Weber, not by White Drug. Weber controls hiring, firing, budgeting, credit and adjustment, and hours of operation. The cafeteria's hours are shorter than the drugstore's hours because most of the cafeteria's clientele is drawn from downtown office workers and businesspersons. The drugstore has never attempted to force the cafeteria to remain open longer than Weber wished.

It is true that some of the practices of the two businesses would tend to support a unified operation theory if other factors essential to the theory were present. We refer here to such practices as the reciprocal discount privileges for cafeteria and drugstore employees, the use of the cafeteria for after-hours meetings by drugstore personnel, the purchase by the drugstore of equipment for cafeteria use, the practice of drug-

store personnel occasionally carrying in cafeteria shipments and carrying out cafeteria garbage, the use of the drugstore safe for cafeteria receipts, and occasional gratuitous references to the cafeteria in drugstore advertising. Taken together, these practices show a close working relationship between the drugstore and the cafeteria. The statute and regulations, however, require more. There is no evidence that White Drug controls the pricing, hiring or firing policies of Weber. Neither is there evidence of any profit sharing between Weber and White Drug. Even if Weber were losing money, he would be obligated to pay sixteen percent of his gross sales in rent to White Drug.

As the questions are put in the legislative history of this portion of the FLSA: "Who receives the profits, suffers the losses, sets the wages and working conditions of the employees, or otherwise manages the business in those respects which are the common attributes of an independent businessman operating a business for profit?" S.Rep. No. 145, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.CODE CONG. & AD. NEWS 1620, 1661. The answer here is that all those functions are performed by Weber. Therefore, under the statute and consistent with the Department's regulations, 29 C.F.R. § 779.225(d), Weber's cafeteria is not a leased department of White Drug and is not covered under the enterprise provisions of the FLSA.

The judgment of the district court is affirmed.

McMILLIAN, Circuit Judge, dissenting.

As noted by the majority, the facts in this case are substantially undisputed. At issue is the interpretation and application of the definition of "enterprise" in the administration of the Fair Labor Standards Act (FLSA). Because I believe that the White House Cafeteria constitutes a "leased department" of the White Drug Store, 29 U.S.C. § 203(r); 29 C.F.R. § 779.225 (1982), I would hold that the White House Cafeteria is subject to the provisions of the FLSA and therefore respectfully dissent.

Review of the "enterprise" cases reveals that similar business arrangements have not produced similar decisions. *Compare Dunlop v. Ashy*, 555 F.2d 1228 (5th Cir.1977) (motel and restaurant operations held not to constitute a "single enterprise"), *with Usery v. Mohs Realty Corp.*, 424 F.Supp. 20 (W.D.Wis.1976) (motel and restaurant operations held to constitute a "single enterprise"). Case law is in agreement, however, about the elements of the "single enterprise" definition: (1) related activities, (2) common business purpose, and (3) unified operation or common control. *E.g., Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 846 (8th Cir.1975); see 29 U.S.C. § 203(r). Unfortunately, these terms are used in the statutory definition but are not themselves defined in the statute; the regulations describe the terms in some detail but in reality provide little guidance. *See* 29 C.F.R. § 779, Subpart C.

I would hold that the cafeteria and the drug store are related activities because each provides auxiliary services to the other. The cafeteria sells food; the drug store sells a great variety of items and provides pharmacy services. They are both retail sales operations. *See Usery v. Mohs Realty Corp.*, 424 F.Supp. at 27; *see also* 29 C.F.R. § 779.208(i) (including "recreational . . . facilities for customers . . . including eating and drinking facilities" as an example of auxiliary activities which are "related activities"). I would also hold that the cafeteria and the drug store have a common business purpose to the extent that each is part of a "business system" which is directed to a single business objective, that is, the operation of a traditional drug store. *See* 29 C.F.R. § 779.213; *Usery v. Mohs Realty Corp.*, 424 F.Supp. at 28.

Finally, I would hold that the "related activities" of the cafeteria and the drug store, although separately owned and separately controlled, are performed through a "unified operation," *see* 29 C.F.R. § 779.-215–.220, and therefore the cafeteria constitutes a leased department of the drug store. *Id.* § 779.225. The cafeteria and the drug store share a common trade name, are lo-

cated in the same building, share a common public entrance, have similar hours of operation (the cafeteria's hours are limited to those of the drug store), appear to be one business operation to persons using the services, and coordinate advertising and promotions to some degree. I realize that the cafeteria occupies a physically distinct space within the drug store, the cafeteria personnel decisions are separate from those of the drug store, and the cafeteria maintains its own set of records. In my opinion, however, these factors do not overcome those factors which are consistent with unified operation. Accordingly, I would reverse the judgment of the district court.