United States Court of Appeals,

Fifth Circuit.

No. 93-7505.

Robert B. REICH, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

BAY, INC., BBI, Inc., a Corporation; and Allen Berry, Defendants-Appellants.

June 17, 1994.

Appeal from the United States District Court for the Southern District of Texas.

Before WOOD,* SMITH, and DUHÉ, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This appeal arises from proceedings the Secretary of Labor (the Secretary) instigated against Bay, Inc. (Bay), BBI, Inc. (BBI), and BBI president Allen Berry for violations of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. (FLSA). Bay is a general contractor that provides construction management, materials, equipment, and other services to refineries. BBI, now defunct, was a subcontractor that provided labor and labor supervision to Bay and other companies. From February 2, 1988 until December 31, 1990, Bay obtained labor through BBI in order to minimize worker's compensation and insurance expenses.

BBI provided two different types of employees to Bay, rig welders and single-hand welders. Rig welders owned their own welding rigs and rented them to Bay for a separately negotiated

---

*Circuit Judge of the Seventh Circuit, sitting by designation.

1

fee.  Single-hand welders, rather than owning their own welding rigs, would utilize equipment owned by Bay.  BBI paid both classifications of welders predetermined hourly rates for straight-time and overtime.  In addition to the hourly wage payments BBI paid to rig welders, Bay negotiated equipment rental rates with the rig welders.  Thus, in each pay period each rig welder received two checks, one from Bay for rig rental and one from BBI for earned wages.

The rate structure for rig welders changed significantly for overtime hours.  Although BBI paid rig welders time-and-a-half for time worked exceeding forty hours, Bay correspondingly reduced the rental rate for rigs used more than forty hours a week to offset roughly the increased hourly wage rate.  Because the reduction in rental fees offset overtime wage increases, rig welders effectively received little overtime compensation, although in name BBI was paying them the required time-and-a-half.

The Secretary charged Bay and BBI with violating the FLSA, contending that their pay structure intentionally circumvented FLSA overtime provisions.  Bay and BBI argue that their practice of discounting rig rental rates simply was the result of economic considerations, and that wages and rental fees are two distinct and independent transactions.  Bay and BBI also contend that they are not sufficiently interrelated to justify examining in conjunction Bay's rig rental rates and BBI's hourly wage rates.

Regarding the interrelatedness of Bay and BBI, the two companies share the same principal office and place of business, a

building wholly owned by Berry Contracting, Inc.[1] The building is identified only by the sign "Berry." One person was responsible for maintaining the business records of both Bay and BBI, and did so in the same location of the Berry building. BBI paid an administration fee for payroll and accounts receivable to Bay.

In addition, members of the Berry family owned and controlled both companies.[2] The officers of Bay include: Ken Luhan, President; K.L. Berry, Vice-President and Assistant Secretary; D.W. Berry, M.G. Berry, Robert M. Davis, Howard Kovar, James G. Gilbert, and Don Spangler, Vice Presidents; and Charlene Washburn, Secretary-Treasurer. Bay directors include M.L. Berry, Laura Berry, and K.L. Berry. Marvin and Laura Berry own all shares of Lone Star Equipment, Inc. (Lone Star), which owns Berry Contracting, Inc., which in turn owns Bay.

BBI also was owned by the Berry family. From December 1987 to November 1988, brothers Kenneth, David, and Martin Berry owned BBI. Kenneth was president, and David and Allen were vice-presidents, and Marvin was a vice-president, assistant secretary, and treasurer. From November 1988 until the demise of BBI in December 1990, another Berry brother, Allen, wholly owned BBI. Allen served as president, and his wife Cathy became secretary and treasurer. Kenneth, David, Marvin, and Allen served as directors of BBI

---

[1]Although BBI's offices were recorded as the home of Kenneth Berry, Allen Berry, the president, worked out the fourth floor of the Berry building.

[2]Marvin L. and Laura Berry are the parents of Kenneth, Allen, Dennis, and Marvin G. Berry.

3

throughout its existence.

The following "Memorandum of Understanding" also illustrates how Bay and BBI were interrelated:

MEMORANDUM OF UNDERSTANDING

Pertaining to Pay Rate for
Rig Welders and their Rigs

I ... understand and agree that while employed as a Rig Welder (WR) by Bay, Inc./BBI, Inc. that my pay will be calculated as follows:

*FIRST 40 HOURS* (each pay period) for welder at $10.50 per hour; first 49 hours for Rig (Equipment) at $12.00 per hour for a *total* of $22.50 per hour.

*HOURS OVER 40* (Overtime) (each pay period) for welder at $15.75 per hour; hours over 40 for Rig (Equipment) at $7.00 per hour for a total of $22.75 per hour.

Other BBI employment forms contained the name of a Bay supervisor or the name or initials of Bay's personnel manager, Jim Hedges. These forms contained wage information, lease rate information for the rig welders' rigs, and federal withholding information. Bay used these forms to calculate the proper wage information and rental amount due to rig welders. Although rig welders received wage checks from BBI, Bay was responsible for calculating the wages pursuant to a payroll servicing agreement with BBI. Bay also performed the following other functions for BBI: (1) paid for and ran advertisements; (2) helped interview prospective employees; (3) supervised BBI employees in some instances, and had the authority to fire; (4) scheduled, assigned, and reviewed the work of BBI's welder employees; and (5) performed random drug testing of BBI employees.

Although BBI had one other client, BBI went out of business in December, 1990, when Bay stopped using BBI employees. Bay accounted for at least 907 of BBI's business. From January 1, 1991 to December 31, 1991, Bay used the services of Professional Constructors, Inc. (PCI) to obtain labor, and after January 1, 1992, ceased the practice of "subcontracting" an intermediate company to obtain labor.

On December 24, 1990, the Secretary filed this action against Bay, BBI, and Allen Berry, the president of BBI, seeking injunctive relief under FLSA Sections 7 and 15(a)(2). The Secretary seeks to enjoin defendants from willfully violating the overtime and record-keeping provisions of the FLSA and "to restrain the defendants from withholding the back wages determined to be due their employees for defendants' willful violations of the Act, an injunction to prohibit future violations of the Act's overtime and record-keeping provisions, and prejudgment interest."

Both parties moved for summary judgment. The district court denied the defendants' motion, but granted the Secretary's motion. The court entered judgment for the Secretary in the amount of $152,186.93 plus prejudgment interest, and enjoined defendants from future violations of the overtime and record-keeping provisions of the FLSA. The defendants filed a timely appeal from the district court judgment.

## ANALYSIS

### A. Single Enterprise

At the outset, we must determine whether Bay and BBI were a

5

single enterprise for the purposes of 29 U.S.C. § 203(r).  Whether

Bay and BBI were a single enterprise is a question of law, which we

review de novo.  *Donovan v. Weber,* 723 F.2d 1388, 1391-92 (8th

Cir.1984);  *Dunlop v. Ashy,* 555 F.2d 1228, 1229 (5th Cir.1977).  To

establish that two entities functioned as a single enterprise, the

Secretary must demonstrate that the entities:  (1) engaged in

related activities;  (2) were a unified operation or under common

control;  and (3) shared a common business purpose.  29 U.S.C. §

203(r);  *Ashy,* 555 F.2d at 1229.  In addressing each of these

elements, we must construe liberally the FLSA while applying it

"with reason and in a common sense fashion."  *Ashy,* 555 F.2d at

1234.

## 1. Related Activities

Because the FLSA does not define the term "related

activities," the district court relied on 29 C.F.R. § 779.206,

*citing* S.Rep. No. 145, 87th Cong., 1st Sess. at 41, for a

definition.  That section of the Code of Federal Regulations

indicates that

> activities will be regarded as "related' when they are the
> same or similar or when they are auxiliary or service
> activities such as warehousing, bookkeeping, purchasing,
> advertising, including, generally, all activities which are
> necessary to the operation and maintenance of the particular
> business....  The Senate Report on the 1966 amendments makes
> it plain that related, even if somewhat different, business
> activities can frequently be part of the same enterprise, and
> that activities having a reasonable connection with the major
> purpose of an enterprise would be considered related.

*Id.*

Under this definition the district court properly concluded

that Bay and BBI engaged in related activities.  The two companies

6

shared office space under one name, "Berry," the family name of the owners of both companies. Bay and BBI also shared several officers and directors. Bay provided BBI with bookkeeping, payroll, recruitment, and advertising services. Both companies kept business records in the same area, and the same individual controlled the records of both companies.

Although Bay is in the business of leasing equipment and BBI was in the business of providing labor, two different purposes, the two entities operations were inextricably linked. Supplying Bay with labor constituted 907 of BBI's business, Bay received the majority of its blue collar labor from BBI, and BBI closed its shop when Bay ceased utilizing its services. The examples discussed in Code of Federal Regulations support this conclusion. *See* 29 C.F.R. § 779.306; *see also Brennan v. Veterans Cleaning Serv., Inc.,* 482 F.2d 1362, 1366-67 (5th Cir.1973) (discussing the meaning of "related" and "auxiliary and service activities"). Bay and BBI had extensive related activities for the purposes of Section 203(r).

## 2. Unified Operation or Common Control

Section 203(r) also requires proof of either common control or unified operation of the companies. 29 U.S.C. § 203(r); *Dunlop v. Lourub Pharmacy, Inc.,* 525 F.2d 235, 236 (6th Cir.1975). The Code of Federal Regulations provides guidance as to what constitutes "common control":

> The word "control" may be defined as the act of fact of controlling; power or authority to control; directing or restraining domination. "Control" thus includes the power or authority to control.... [It] includes the power to direct, restrict, regulate, govern, or administer the performance of the activities. "Common" control includes the sharing of

7

control and it is not limited to sole control or complete control by one person or corporation.  "Common" control therefore exists where the performance of the described activities are controlled by one person or by a number of persons, corporations, or other organizational units acting together.

29 C.F.R. § 779.221.

The similarities between those in control of Bay and BBI were extensive:

| Berry Family Member | Bay Positions | BBI Positions |
| --- | --- | --- |
| Kenneth | Director | Vice-President, Assistant Secretary, and Director |
| Dennis | Vice President | Director |
| Marvin G. | Vice President | Director |
| Marvin L. | Director & Owner | |
| Laura | Director & Owner | |
| Allen | | Sole Owner 11/88-12/90; Director |

The only individuals unrelated to the Berry family who held management positions in BBI were Howard Kovar, James G. Gilbert, Jr. and Donald Spangler, vice-presidents;  and Charlene Washburn, Secretary-Treasurer.

In determining whether Bay and BBI had common control, "the determinative question is whether a common entity has the power to control the related business operations." *Donovan v. Easton Land & Development, Inc.,* 723 F.2d 1549, 1552-53 (11th Cir.1984), citing

8

*Shultz v. Mack Farland & Sons Roofing Co.,* 413 F.2d 1296, 1301 (5th Cir.1969). At the time Bay and BBI entered into the labor arrangement at issue, three of the Berry brothers held positions of control in both companies, and members of the Berry family owned both companies. These facts support the conclusion that Bay and BBI were under common control. *See Mack Farland,* 413 F.2d at 1301 ("Common control may exist ... despite the separate management of the individual establishments.").

Bay and BBI also had a unified operation. The Code of Federal Regulations also informs on the definition of a unified operation:

> Whether there is unified operation of related activities will thus be of concern primarily in those cases where the related activities are separately owned or controlled but where, through arrangement, agreement or otherwise, they are so performed as to constitute a unified business system organized for a common business purpose.

29 C.F.R. § 779.220 (1993). Bay performed many different functions for BBI, including advertising for recruitment, payroll, and bookkeeping. As the district court explained, Bay and BBI

> were mutually parasitic. Both Bay and BBI received benefits because of their unification. Bay saved money by having BBI administer the worker's compensation, insurance and unemployment coverage. BBI benefitted from its relationship with Bay through reduced administrative costs, increased rent, and combined recruitment costs.

These facts suggest that BBI and Bay were engaged in a unified business operation. *See Easton Land,* 723 F.2d at 1552.

### 3. Common Business Purpose

Having established that Bay and BBI were engaged in related activities and had unified operation or common control, it becomes

9

manifest that Bay and BBI also shared a common business purpose. A common business purpose exists if "the separate corporations engaged in complementary businesses, and were to a significant degree operationally interdependent." *Donovan v. Janitorial Services, Inc.,* 672 F.2d 528, 530 (5th Cir.1982). *See also Donovan v. Grim Hotel Co.,* 747 F.2d 966, 971 (5th Cir.1984); *Brennan v. Veterans Cleaning Serv., Inc.,* 482 F.2d 1362, 1367 (5th Cir.1973). As previously explained, Bay and BBI complemented and depended on each other; Bay filled its labor needs with BBI employees, and constituted over 907 of BBI's business. Bay and BBI do not raise any arguments that challenge this conclusion. Because all three elements of an enterprise are satisfied, the district court correctly held that Bay and BBI were a single enterprise for the purposes of the FLSA from February 2, 1988 to December 31, 1990.

B. Violation of the FLSA

Whether the compensation method used by Bay and BBI violated the FLSA is the central issue presented by this appeal. The defendants rely on *Durkin v. Santiam Lumber Co.,* 115 F.Supp. 548 (D.Or.1953), as persuasive authority that their compensation method was permissible. In *Santiam Lumber,* truck drivers who owned their own truck received two payments: their salary and a rental payment for use of their truck. *Id.* at 549. When the drivers were required to work overtime, their rental payment decreased and their wage rate increased. *Id.* The district court held that an owner-operator can occupy a dual role, as "both an entrepreneur owning capital equipment and a laborer operating such equipment."

10

*Id.* at 550. The court reached that conclusion because the non-labor costs of operating log-hauling trucks decreased as use increased. *Id.*[3]

The district court in this case, however, found that *Santiam Lumber* was wrongly decided. The district court reasoned that *Santiam Lumber* treated the employees as independent contractors, which they were not. Instead, the district court relied on *Donovan v. Global Divers & Contractors, Inc.,* 1982 WL 2162 (W.D.La.1982), and *Goldberg v. Maine Asphalt Road Corp.,* 206 F.Supp. 913 (D.Me.1962).

In *Global Divers,* the employer paid its employees an hourly rate plus overtime compensation, and a gear rental fee. 1982 WL 2162, at *1. After the employee worked a specific number of hours, in most cases the daily rental fee was reduced by the amount of overtime compensation paid to the employee on that day. *Id.* The court held that this practice violated the FLSA, explaining that the FLSA was intended to reduce the burden of working lengthy hours and to put financial pressure on employers to spread employment, and that Global Divers' compensation scheme circumvented these goals. *Id.* at *3. *See also Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 42, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944).

Similarly, in *Maine Asphalt* the employer hired employees who owned their own trucks. 206 F.Supp. at 913. The employer paid

---

[3]Although we have not conducted an in-depth study of the log-hauling industry, we wonder whether the district court in *Santiam Lumber* took into account the depreciation surely associated with increased truck usage in reaching its cost determination.

each driver their wages and a truck rental fee. *Id.* When the employee worked overtime their wage was increased by 507 and the truck rental was reduced by an equal amount. *Id.* The court held that this practice violated the FLSA, noting the absence of an independent economic or other reason for the offsetting rates of compensation. *Id.* at 915-16.

The defendants attempt to distinguish *Global Divers* and *Maine Asphalt* by pointing out that in those cases, employees were required as a condition of employment to furnish their own equipment, whereas they were not at Bay and BBI. This argument is without merit for two reasons. First, nothing in the *Maine Asphalt* opinion reveals that employees were required to furnish their own equipment—the defendant's claimed distinction therefore does not exist. Second, giving employees the option of either renting their equipment out at reduced rates after 40 hours or not renting it out at all is a false choice. Bay and BBI could no more do that under the FLSA than give their single-hand welders (those without rigs) the choice of either forgoing additional overtime compensation or finding a different employer.

The reasoning of *Global Divers* and *Maine Asphalt* fits well in this case. As *Global Divers* and *Maine Asphalt* noted, one of the primary purposes of the FLSA is to financially pressure employers to spread employment. Permitting negligible net pay increases for overtime hours worked, as occurred with Bay and BBI, would eviscerate the incentive provided by the FLSA to use more workers for forty hours rather than fewer workers for longer hours.

12

Although the defendants argue that the number of rig hours (the hours that the rig is utilized in any given week) did not necessarily correspond with the man hours (amount of time that the rig welders actually work) for each employee, a review of the record suggests that on the whole the number of man hours and rig hours largely offset, in effect avoiding the overtime provisions of the FLSA. The net effect was to provide less than time-and-a-half compensation to Bay and BBI employees, violating the FLSA.

The defendants also argue that their method of computing wages was not a scheme to circumvent the FLSA, but rather was necessary to compete in the marketplace. That argument is fallacious, however, for all employers competing in the marketplace must comply with the overtime provisions of the FLSA. The defendants have provided no credible economic or other explanation of why the reduction in rental rates largely offsets the overtime pay increases mandated by the FLSA. The district court therefore correctly concluded that the compensation method of Bay and BBI impermissibly circumvented the FLSA.

## C. Wilfulness

As a final issue, the defendants argue that their violations of the FLSA were not willful, and therefore were subject to a two-year, rather than three-year, statute of limitations. *See* 29 U.S.C. § 255(a). The proper test for determining whether a party acted willfully is contained in *McLaughlin v. Richland Shoe Co.,*

13

486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988).[4] In *Richland Shoe,* the Court held that violations under the FLSA are willful if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.*

The conduct of Bay and BBI falls within the *Richland Shoe* definition of wilful. Bobby Scott, the District Director for the local Wage and Hour office, contacted Don Spangler, one of the defendants' representatives, and informed him that the overtime payment practices of Bay and BBI violated the FLSA. Continuing the payment practices without further investigation into the alleged violation could constitute "reckless disregard" of the FLSA. Bay and BBI had sufficient time after hearing from Mr. Scott to investigate their payment practices and correct the problem. The fact that Bay continued a substantially similar arrangement with PCI after BBI became defunct bolsters this conclusion. The district court correctly decided to apply the three-year statute of limitations.

The district court order granting summary judgment in favor of the plaintiff, enjoining the defendants from paying less than

---

[4]The district court incorrectly applied a slightly different test. To find willfulness "entails a determination of whether "there is substantial evidence in the record to support a finding that the employer knew or suspected that his actions might violate the FLSA." *Donovan v. Sabine Irrigation,* 695 F.2d 190, 196 (5th Cir.1983). The court in *Sabine Irrigation* cited *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972), as the source for the test on willfulness. *Jiffy June,* however, was criticized and rejected by the *Richland Shoe* Court because it "virtually obliterates any distinction between willful and nonwillful violations." *Richland Shoe,* 486 U.S. at 132-34, 108 S.Ct. at 1681-82.

14

time-and-a-half overtime compensation, and awarding their employees

$152,186.93 in withheld overtime compensation is AFFIRMED.